Morris R. PALMER et al., Plaintiffs,

v.

COLUMBIA GAS COMPANY OF OHIO,
Inc., Defendant.

No. C 72–14.

United States District Court,
N. D. Ohio, W. D.

May 2, 1972.

R. Michael Frank, Russell Kelm, Toledo, Ohio, for plaintiffs.

Franklin Hayward, John Hayward, Cary Cooper, Toledo, Ohio, for defendant.

## OPINION

DON J. YOUNG, District Judge:

This action was commenced by the plaintiffs individually and as a class action seeking injunction, compensatory and punitive damages, and declaratory relief.

The complaint alleged that the defendant, acting under color of state law, and particularly under Section 4933.12 of the Ohio Revised Code, had terminated

gas service to the named plaintiffs, and in so doing had deprived the named plaintiffs and the class they represent of procedural due process guaranteed them by the Fifth and Fourteenth Amendments to the United States Constitution. The class was described as all customers of the defendant who had had their gas service involuntarily terminated, or who would in the future have the same so terminated.

A temporary restraining order was entered, and a three-judge court was empaneled to hear the plaintiffs' motion for a preliminary injunction and the defendant's motion to dismiss for failure to state a claim and for lack of jurisdiction. After it convened, that Court determined that the issues presented were not properly triable by a three-judge panel, and dissolved itself, leaving the matter to be heard by a single judge of the District Court.

The matter of the issuance of a preliminary injunction was heard upon the evidence over a period of two days. Motions were filed by a number of individuals for leave to intervene as parties plaintiff. Ruling upon the motion to intervene was reserved, the defendant's motion to dismiss was overruled, and a preliminary injunction was issued, which by stipulation was confined to the operations of the defendant company in its northwestern district.

The defendant filed an answer setting forth five defenses, and a counterclaim against the named plaintiffs upon an account for gas furnished to them. The named plaintiffs filed a reply denying any account between them and the defendant, and setting up as an affirmative defense that the counterclaim did not state a claim upon which relief could be granted. The defendant also filed a motion to dismiss the class action.

Thereafter, the matter came on to be heard upon the issue of the right of the plaintiffs and the class of plaintiffs to injunctive relief. Determination of issues involved in the motion to dismiss the class action, and limiting or defining

the class was reserved, as was the matter of damages.

Further evidence was adduced, from which it appeared that violations of the preliminary injunction had occurred on the very day that the final hearing on the issue of injunctive relief was taking place. At the conclusion of the hearing, the Court reserved its ruling.

Shortly after the hearing, plaintiffs filed a motion for an order requiring the defendant to show cause why it should not be punished for contempt for the violations of the preliminary injunction. An order to show cause was issued and the matter was heard. The Court found from the evidence at the hearing that the injunction had been violated by an employee of the defendant acting contrary to instructions given him by his superiors, and that the defendant had remedied the violations promptly after it discovered they had occurred. The Court discharged the rule to show cause against the defendant, and since no order to show cause had been issued against the offending employee, so that he had not been given notice and an opportunity to be heard, no punishment could be visited upon him for his contemptuous acts.

These preliminary matters aside, the case is now in a posture to rule upon the question of whether the plaintiffs are entitled to injunctive relief.

The evidence shows that the defendant Company is a very large concern, with its headquarters in Columbus, Ohio, which is about a hundred and forty miles from Toledo. All of the billing and issuing notices of termination of service, hereinafter referred to as "shut-off notices", were, at the time the action was commenced, handled by a computer in Columbus. All bills and notices were mailed there, although the envelopes bore as a return address the defendant's Toledo office address.

The defendant has approximately one hundred forty thousand customers who are served by its Toledo office alone. During any calendar year, from one

hundred twenty to one hundred forty thousand shut-off notices are issued for this office, and about six thousand actual shut-offs are made. About fifteen hundred of these would be made during the five winter heating months from November to March. During the month of December, 1971, about nine thousand shut-off notices were issued, and about four hundred actual shut-offs made.

The procedures are for the defendant to read meters no oftener than bi-monthly, but sometimes no readings of particular meters are made for periods of many months. The defendant's computer is programmed to estimate bills when no readings are available to show the actual amount of gas consumed.

If a monthly bill is not paid by the consumer, this amount is carried forward and added to the bill for the succeeding month. If the total for that month were not paid by the due date, a shut-off notice would be issued to the consumer approximately five days later. The shut-off notice indicates that the consumer has four days to pay the bill. If the bill is not paid, at the end of that period an employee called a "collector" goes out and shuts off the gas.

The evidence showed that the estimated bills issued by the computer were usually underestimated; that often when a protracted period elapsed without an actual meter reading being made, the bill after the meter was read would be many times greater than the consumer's usual bill, and sometimes the consumer, especially if he were poverty-stricken, would be unable to pay so large a sum; that in such case the consumer could make arrangements to pay the sum over a period of time, but each month during such period he would receive a shut-off notice, which he was sometimes told by the defendant to ignore, but which, in any event, was not enforced by an actual shut-off; and that there were other types of dispute between the defendant and its consumers which resulted in shut-off notices being sent after the dispute was resolved, shut-offs sometimes being made without warning under those notices.

The evidence also showed that when the collectors went out to shut off gas, they frequently did so without any announcement whatever to the consumer, even though the consumer was sitting right in his house, so that the first notice he would have of the shut-off was that his house got cold, or his kitchen range would not light; that mistakes were made, so that a consumer who received a shut-off notice and promptly paid the bill sometimes found his gas service terminated anyway; and that in many cases, when the service was shut off, even though the bill had been paid, or when it was paid promptly after the shut-off, it was sometimes a matter of days before service was restored.

The evidence also showed that the defendant's collectors and clerical employees were hostile, arrogant, and unyielding in dealing with consumers whose gas service had, rightly or wrongly, been terminated. Often the consumer could get relief only by appealing to some influential person in the community who could use his connections to by-pass the defendant's clerical employees and get through to some one of defendant's executives.

The evidence as a whole revealed a rather shockingly callous and impersonal attitude upon the part of the defendant, which relied uncritically upon its computer, located in a distant city, and the far from infallible clerks who served it, and paid no attention to the notorious uncertainties of the postal service.

Although it was hardly necessary to do so, plaintiffs produced evidence that winters in Ohio, and particularly in northern Ohio, are usually bitterly cold, wet and windy. A recent newspaper article told of an Englishman who rode a bicycle around the world, but his journey almost failed when he ran into a northern Ohio winter storm, the only climatic difficulty which actually threat-

ened the completion of his expedition.[1] The lack of heat in the winter time has very serious effects upon the physical health of human beings, and can easily be fatal. A sudden withdrawal of heating fuel can also result in severe damage to property, both real and personal.

The evidence leaves no doubt whatever that the consequences of shutting off gas service inflicts hardships upon the consumer that far transcend the loss of driving privileges, Bell v. Burson, 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971), delay in paying unemployment compensation, California Dept. of Human Resources Development v. Java, 402 U.S. 121, 91 S.Ct. 1347, 28 L.Ed.2d 666 (1971), or even the denial of direct relief payments, Goldberg v. Kelly, 397 U.S. 263, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). A person can freeze to death or die of pneumonia much more quickly than he can starve to death.

■ Thus there is no question of the entitlement involved. Neither is there any question that the defendant's shut-off procedures, especially when actually followed up by a shut-off, are clearly offensive to even the most elementary notion of what constitutes due process. Mailing out a vast number of shut-off notices, only about four percent of which were followed by actually taking the action threatened, making no attempt to give actual notice when so drastic an action was taken, and taking the action arbitrarily without giving the slightest opportunity to question or dispute it, even when it was unquestionably improper, are not the ingredients of due process.

The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation. Cafeteria and Restaurant Workers Union, Local 473, A.F.L.–C.I.O. v. McElroy, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed. 2d 1230 (1961).

The defendant's shut-off procedures appear clearly to be designed only for its own convenience and efficiency. Certainly as the evidence shows them to have been carried out in practice, they are quick and efficacious.

But the Constitution recognizes higher values than speed and efficiency. Indeed, one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy which may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones. Stanley v. Illinois, 405 U.S. 645, 656, 92 S.Ct. 1208, 1215, 31 L.Ed.2d 551 (1972).

The important question, therefore, is the purely legal one of whether the actions of the defendant were taken under color of state law or constituted state action, for it is elementary that the Civil Rights Act, 42 U.S.C. Section 1983, is not applicable to the purely private actions of private individuals or corporations.

■ As in other areas of law, there are borderlines between governmental and private action, and there can be no question but that the facts set forth put this problem right at the borderline. As usual, there are cases reported which lie on each side of the borderline. Such cases offer some guidance to resolution of the question, but ultimately the determination must be made upon the particular factual basis involved. Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967).

■ It is clear that as a general rule, the fact that a corporation is subject to some degree of state regulation, or is granted some special rights or privileges by the state, is not enough to convert the essentially administrative or business actions of the corporation into that state action which the Civil Rights Act proscribes.

1. Norwalk Reflector, April 5, 1972 at 1.

However, as the Supreme Court held in Public Utilities Comm'n of District of Columbia v. Pollak, 343 U.S. 451, 462, 72 S.Ct. 813, 96 L.Ed. 1068 (1952), operation under regulatory supervision of the Public Utilities Commission is the key factor to be considered. The Supreme Court quotes with approval the language of American Communications Assn. C. I. O. v. Douds, 339 U.S. 382, 401, 70 S.Ct. 674, 685, 94 L.Ed. 925 (1950).

> [W]hen authority derives in part from Government's thumb on the scales, the exercise of that power becomes closely akin, in some respects, to its exercise by Government itself.

It is not disputed in the present case that the defendant, under the laws of the State of Ohio, enjoys a monopoly in the supplying of natural gas within the area that it serves, and that it is subject to regulation by the Public Utilities Commission of Ohio. Section 4905.26 of the Ohio Revised Code provides in part that:

> Upon complaint in writing against any public utility by any person . . . that any . . . practice affecting or relating to any service furnished by said public utility, or in connection with such service, is, or will be, in any respect unreasonable, [or] unjust, . . . the commission shall fix a time for hearing . . . .

Section 4933.12 of the Ohio Revised Code provides in part that:

> If any person supplied with gas neglects or refuses to pay the amount due for such gas . . . the company may stop the gas from entering the premises of such person. In such cases, after twenty-four hours' notice, the officers, servants, or workmen of the gas company may enter the premises of such parties, between eight a. m. and four p. m., . . . and disconnect any meter from the mains or pipes of the company . . . .

Clearly these statutes, particularly the latter one, show that the governmental relations with the defendant are far different and far greater than the mere provisions for enfranchisement of ordinary business enterprises. The state's thumb is indeed heavy upon the scales in Section 4933.12 of the Ohio Revised Code, even though it attempts by Section 4905.26 of the Ohio Revised Code to offer means of relief to those who suffer from the uneven balance. The former statute clearly does not leave "untouched the general managerial direction" of a privately owned, financed and managed gas company which is operated independently of state regulation. *See* Ihrke v. Northern States Power Co., 459 F.2d 566, 568 (8th Cir. 1972).

■ Nor will it do to say that Section 4933.12 of the Ohio Revised Code does not give the defendant any privilege that did not exist at common law, or that may be exercised by any businessman in refusing to deal with a customer who does not pay for what he receives.[2] This statute permits the defendant to enter upon the private property of another to accomplish its purposes. It also gives the utility the right to refuse to supply a particular individu-

---

**2.** For whatever the reason, the Ohio Legislature in its infinite wisdom decided to bestow upon the gas company a right to terminate the furnishing of gas to those customers who refused to make payment. Action brought pursuant to that statute is action under color of state law. *see* Davis v. Weir, 328 F.Supp. 317 (N.D. Ga.1971). Kadlec v. Illinois Bell Tel. Co., 407 F.2d 624 (7th Cir. 1969), cert denied, 396 U.S. 846, 90 S.Ct. 90, 24 L.Ed.2d 95 (1969) does not dictate a contrary conclusion. There, the court held that the telephone company's filing of its regulations with state authorities and subsequent action pursuant to those regulations did not constitute action under color of state law, as the telephone company was acting pursuant to its "own regulations." The nexus between the state and the telephone company's conduct was not sufficient to maintain an action under the Civil Rights Act, the *Kadlec* court concluded. *But see* Lucas v. Wisconsin Electric Power Co., 322 F.Supp. 337 (E.D.Wis.1970).

al with an essential service which, because of the monopoly which the government has granted, the individual cannot obtain elsewhere.

When the defendant's collectors enter upon private property to carry out the procedures necessary to shut off a customer's gas, they are acting in a governmental capacity, and exercising the police power of the state. The action is not analogous to a merchant telling a customer he can get no more merchandise until he has paid for what he has already had. It is the action of a sheriff or constable executing a writ of restitution, or a writ of replevin, entering upon private premises to deprive a person thereon of his possession or his goods.

This Court does not hold that where a gas company's activities are pervasively regulated, any action taken by the gas company constitutes state action. Rather, this case stands for the proposition that only the particular activity which comes under the umbrella of a state statute or state authorized regulation constitutes state action. *see* Public Utilities Comm'n of District of Columbia v. Pollak, *supra*.

■ This Court concludes that it has jurisdiction under the Civil Rights Act to grant injunctive relief as prayed for in the complaint.

Pending determination of the proper limitations on the class of plaintiffs, the limited preliminary injunction heretofore issued will be continued in force, and this cause will be continued for further hearing upon the matter of the scope of the class of plaintiffs, and upon the issue of damages.

This Court is further of the opinion that this decision involves a controlling question of law as to which there is substantial grounds for difference of opinion, and that an immediate appeal from the order to be entered expressive of this Court's conclusions may materially advance the ultimate termination of the litigation.