**Morris A. PALMER et al., Plaintiff-Appellee,**

and

**Alice Taylor et al., Intervening Plaintiff-Appellee,**

v.

**COLUMBIA GAS OF OHIO, INC., Defendant-Appellant.**

No. 72–1772.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 13, 1973.

Decided May 22, 1973.

Cary Rodman Cooper and Richard S. Walinski, Toledo, Ohio, for defendant-appellant; Franklin F. Hayward, Hayward, Cooper, Straub, Walinski, Cramer & Co., Toledo, Ohio, R. N. Mahaffey, Columbus, Ohio, on brief.

Russell A. Kelm and Joseph F. Vargyas, Toledo, Ohio, for plaintiff-appellee; R. Michael Frank, Frank S. Merritt, ABLE, INC., Toledo, Ohio, on brief.

Edward J. Dailey, National Consumer Law Center, Inc., Chestnut Hill, Mass., on brief for amicus curiae.

Franklin Arthur Martens, Ohio State Legal Services Assn., Columbus, Ohio, on brief for amici curiae.

Before EDWARDS, PECK and McCREE, Circuit Judges.

JOHN W. PECK, Circuit Judge.

I

The plaintiffs, residential customers of natural gas supplied by the defendant Columbia Gas Company, brought this class action for injunctive and declaratory relief and for damages, alleging that their gas service had been terminated under color of state law in violation of their constitutional right to due process.

The Columbia Gas Company is a large, privately owned, pervasively regulated public utility company. It serves over 140,000 customers in the Toledo, Ohio, area,[1] and all of its billing is handled by computer in Columbus, Ohio. A reading is normally taken from each customer's meter every other month, although on occasion no reading may be taken for a period of many months. When no reading is taken to reflect actual usage, the company's computer estimates usage and calculates an amount which is then billed to the customer. For some reason which is not made clear in the record, the computer usually underestimates in these situations; consequently, when an actual reading is eventually made after a series of several computer estimates, the resulting bill for actual gas consumed can be surprisingly high.[2] In these cases, the customer, expecially if poor, often has been unable to pay a bill several times larger than normal.

Whenever a monthly bill is not paid by the customer, the amount is carried forward and added to the customer's next bill. Whenever the second month's bill is not paid by five days after the due date and the amount in arrears is $20 or more, a notice of termination (a "shut-off notice") is sent to the customer:

COLUMBIA GAS OF OHIO. INC.
701 JEFFERSON AVENUE
TOLEDO OH 43624

PAYABLE AT COMPANY OFFICE

GCD LO UN BK ACC# C α
341 13 05 52 2820 3 0 ⊦

L3823

RETAIN THIS NOTICE FOR YOUR RECORDS.
PLEASE RETURN THE ENCLOSED CARD
WITH YOUR PAYMENT.

COMPANY OFFICE HOURS- MONDAY THRU FRIDAY · 9:00 A M. TO 4:45 P.M. 7152

1042 AVONDALE AV 12
SERVICE ADDRESS

BARBARA BELL
1042 AVONDALE AV
TOLEDO OHIO 43607

### FINAL NOTICE

Your account is Past Due.
Unless the Past Due amount is paid, or satisfactory arrangements are made with this office, it will be necessary to discontinue service to you without further notice.
This Past Due amount should be paid at the Local Office. Our servicemen and collection agencies are not authorized to accept such payments.
If payment has been made, please disregard this notice.

| If shut-off is necessary, Budget Customer must pay total amount before service is reconnected | Service will be discontinued if payment is not received by: | Past Due Pay This Amount |
|---|---|---|
| | 03-10-72 | 131.26 |

If payment is not made within five days of the issuance of the shut-off notice, an employee of the company called "a collector"[3] goes to the residence and terminates the service. Although this employee is authorized to grant temporary extensions of time in which payment may be made, he is under no obligation to inform the occupants of the premises that he is about to terminate gas serv-

1. The Company serves an area larger than Toledo, but by stipulation the scope of the Court's preliminary injunction was limited to the company's Northwestern District, the Toledo area.

2. For example, one of the plaintiffs received a series of estimated bills ranging in amount from $10 to $15; after an actual reading was taken, the bill for actual gas consumed was almost $200.

3. The reason for the designation of this employee as such is not clear, since he is not authorized to accept payment or partial payment of a bill.

ice, and he usually will make no contact at all with the occupants, even to verify the correctness of the address.[4]

The evidence established that however imperfect the company's procedure was in theory, in practice it was more so. Significant and tragic mistakes were often made; for example, one witness testified that his gas service was terminated even though he had paid his bill in full upon receipt of a final notice. One of the intervening plaintiffs testified that his gas service was unexpectedly terminated on January 4, even though he had paid his bill, by mail, on December 30. When he contacted the company by telephone and informed them that he had paid the bill, an employee of the company replied: "Tough. Pay the bill again." This customer had seven children, and the temperature in his house dropped to 45 degrees before service was eventually restored through the intervention of the Board of Community Relations.

Additional confusion is introduced into the company's procedures by the fact that when a customer did make special arrangements for deferred payments of a larger than usual bill, a shut-off notice would be sent with each monthly bill, which the customer would be instructed to disregard. For example, one plaintiff testified that after having been billed about $12.00 a month for a series of about 5 estimated bills, she received a bill for actual usage for over $197.00. She made special arrangements to pay this large amount over a period of months, during which time she received a shut-off notice each month and an ad-

ditional notice requesting that she disregard the shut-off notice. Although she paid the stipulated amount monthly, her service was terminated in mid-December, until, through the eventual intervention of her church pastor, the company acknowledged its mistake, apologized and restored service.

Administrative and clerical errors also resulted in unpleasant surprises for the company's customers. One witness testified that he received on December 30 a notice that his service would be terminated if his bill were not paid by January 4. He mailed his personal check to the company on December 30, which was endorsed by the company and cashed on January 3. Nevertheless, on January 4, his service was terminated. The first that he, his three children and his pregnant wife learned of the termination was when it started to get cold in the house. The company showed that a clerical employee had misplaced the record of the customer's payment, thereby causing this unwarranted termination.

After two days of hearing what one court has aptly described as a bizarre "Orwellian nightmare,"[5] the District Court concluded:

"The evidence as a whole revealed a rather shockingly callous and impersonal attitude upon the part of the defendant, which relied uncritically upon its computer, located in a distant city, and the far from infallible clerks who served it, and paid no attention to the notorious uncertainties of the postal service." Palmer v. Columbia Gas of Ohio, 342 F.Supp. 241, 243 (N.D.Ohio 1972).

4. One plaintiff testified that when her gas service was suddenly terminated without notice, the gas company apologized for the mistake and informed her that they had intended to terminate the gas service for another apartment in the same building.

5. Bronson v. Consolidated Edison of New York, 350 F.Supp. 443 (S.D.N.Y.1972). In that case, the plaintiff, upset at a sudden and drastic increase in the amount of her monthly electric bill, caused an investigation to be made which resulted in the discovery by the utility company that her landlord had been diverting current through her meter. Nevertheless, the higher bills continued, and when she refused to pay, the company terminated service. After three weeks without electricity, she paid the bill, and the amount was credited to her account. However, her check was lost by the bank; the bank notified the company that they had not received the check, and the company then re-entered the deficit in the customer's account. At this point, the customer instigated litigation.

---

The Court found that termination procedures of the company constitute action taken under color of state law because an Ohio statute, § 4933.12, O.R.C., authorizes the company to enter the premises of a customer who has not paid his bill for the purposes of disconnecting and removing its equipment.[6] The Court also found that the termination procedures of the company "are clearly offensive to even the most elementary notion of what constitutes due process." 342 F.Supp. at 244.

Accordingly, the Court ordered that the company not terminate, interrupt, cut-off or interfere with gas service to any residential customer of the company in its Northwestern District (the Toledo area) except in conformity with the following conditions: Any individual employee of the company charged with the mechanical process of terminating the gas service of any customer must first speak personally with that customer or some responsible adult member of his household [7] and inform him of his intention to terminate gas service to that residence. Should the customer indicate that his account with the company has been paid or that he disputes the amount of the bill, the employee shall not terminate the gas service for at least 24 hours. If the customer fails to contact the company in that time,[8] his service may be terminated without further notice. If the customer is unavailable, the company shall send a notice to the customer via certified mail, return receipt requested, advising him of its intention to terminate service for nonpayment of bills unless, within 24 hours after the company receives the return receipt, the company receives payment or the customer notifies the company that the bill has been paid or that he is engaged in a dispute concerning the account.

If the customer communicates, by telephone or otherwise, with the company's office within 24 hours, the company may take no further action toward termination of service until some officer or employee of the company, no lower in position than Office Manager, Local Manager, or person who performs a comparable function, shall have addressed himself to the customer's communication, made inquiry into any factual disputes presented by the customer and made a direct individual response to the customer, explaining in detail the company's position.[9] If the response of the officer does not resolve the dispute as to the

---

6. No factual issue is presented concerning the fact that employees of the company entered private property for the purposes of terminating gas service; the testimony of several witnesses supports this circumstance, which alone is enough to distinguish this case from Lucas v. Wisconsin Electric Power Co., 466 F.2d 638 (7th Cir. 1972), which declined to find state action. In that case, no allegation was made that employees of the company entered private property. The Court observed that the state has authorized entry onto private property under certain circumstances, and noted: "If that authority were invoked by the defendants in this case, an entirely different issue would be presented." 466 F.2d at 656.

7. The District Court has ordered the company to make "residence service" of the notice to terminate service for nonpayment. This should be distinguished from "personal service" which would require the company to notify the customer or person who has opened the account. The

procedure required by the order of the District Court is similar in operation to the service of process requirements of Federal Rule of Civil Procedure 4(d)(1). *See generally*, 2 Moore's Federal Practice, ¶ 4.11 [3] and 4.12 (1970).

8. The order provides that the employee shall orally advise the customer or adult member of his household that if he does not, within 24 hours communicate with the company's office, he will thereafter return and terminate the gas service without further notice.

9. If the company makes an oral response to the customer, the company must reduce the response to writing and send a copy to the customer by certified mail, return receipt requested, prior to any termination of service. The Court's order provides that it shall not be interpreted to prohibit the investigation officer from assigning the detailed investigation to one or more of the company's supervisors who report directly to such officer.

amount claimed to be due from the customer, the termination of service shall be stayed upon the giving of bond with good and sufficient surety [10] not to exceed the amount in dispute. Further resolution of the dispute may be made either by the action of a higher ranking officer or employee of the company which meets with the satisfaction of the customer or by litigation commenced by the company to collect the amount in dispute.

If the dispute concerns a deficiency which is a result of a series of underestimated bills, service may not be terminated for non-payment of the amount due, but the deficiency must be prorated and billed to the customer in monthly installments not greater than the average monthly amount for that residence for the previous twelve months. These prorated amounts may then be billed to the customer in addition to his regular current charges.

Finally, the Court's order provides that service may be terminated without notice of any kind in an emergency situation where the inhabitants or the public health or safety are threatened; following the correction of the cause of the emergency, service must be restored and terminated only in accordance with the provisions of the Court's order.

The District Court reserved judgment on the pending questions of the proper limitation of the class action aspect of the case and upon the question of damages. The Court certified that its decision involved a controlling question of law as to which there is substantial grounds for a difference of opinion such that an immediate appeal from the Court's order would materially advance the ultimate termination of the litigation. This Court granted leave for an interlocutory appeal pursuant to 28 U.S. C. § 1292(b) upon the two controlling questions involved in the decision of the District Court. With the consent of all parties, amicus briefs were filed with this Court in support of the plaintiffs' position by the Ohio State Legal Services Association [11] and by the National Consumer Law Center, Inc. The two principal issues to be determined by this Court are whether the company's actions in terminating service for nonpayment of bills constitute state action or action taken under color of state law, and if so, whether the existing procedures of the company constitute due process; we deal first with the question of state action.[12]

10. The condition of the bond shall be that if the customer shall promptly pay any sum agreed upon or awarded by the Court, the bond shall be null and void, otherwise to be in full force and effect. In lieu of sufficient surety, the customer may post a cash bond. Bond must be made within three days of giving a response to the company.

11. This association has filed a single brief on behalf of its members, The Consumers League of Ohio, The Consumer Protection Association of Cleveland, The Allen County Legal Aid Association, The Butler County Legal Assistance Program, The Legal Aid Society of Cincinnati, The Legal Aid Society of Cleveland, The Legal Aid and Defender Society of Columbus, The Legal Aid Society of Dayton, The Licking County Legal Aid Society, The Legal Aid Society of Lorain County, Inc., The Mahoning County Legal Assistance Association, The Scioto County Legal Aid Association, The Stark County Legal Aid Society, The Summit County Legal Aid

Society, The Toledo Legal Aid Society and The Tuscarawas Valley Legal Services Association.

12. The usual preliminary issue of whether the deprivation complained of is of the type which may be afforded due process protection is not presented by the appellant. In not raising this issue, the company apparently concedes that its service is a specialized type of property which presents distinct problems in our economic system, the taking of which may impose tremendous hardship upon its customers. In this regard, see Lynch v. Household Finance Corp., 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). *See generally*: Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv.L.Rev. 1439 (1968); Reich, The New Property, 73 Yale L.J. 733 (1964); Shelton, The Shutoff of

## II

## STATE ACTION

 This suit was brought pursuant to both the Due Process Clause of the Fourteenth Amendment and 42 U.S. C. § 1983, the Civil Rights Act. The Fourteenth Amendment provides in relevant part: "Nor shall any State deprive any person of life, liberty, or property, without due process of law." It is clear that this clause does not prohibit action by a private individual unless the State, in any of its manifestations, has in some way involved itself in the actions of an individual to some significant extent. Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 6 L. Ed.2d 45 (1961). While the principal focus of the constitutional amendment is upon action taken by the state, the principal focus of the statute is upon private conduct taken "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory," 42 U. S.C. § 1983. This section of the Civil Rights Act not only prohibits action taken pursuant to state law, but also the misuse of power possessed by virtue of state law when the actor is clothed with the authority of state law. Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L. Ed.2d 492 (1961); Screws v. United States, 325 U.S. 91, 65 S.Ct. 1031, 89 L. Ed. 1495 (1945); United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941). Further distinction between the two would appear unnecessary since the concepts are apparently treated as synonymous, United States v. Price, 383 U.S. 787, 794 n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966), and for the purposes of this case we need not distinguish between action taken under color of state law and state action in violation of the Fourteenth Amendment.

The thrust of the state action cases taken as a whole indicates that conduct apparently private may be essentially public when inexorably entwined with governmental regulation or policies. Evans v. Newton, 382 U.S. 296, 299, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966). In a variety of situations, private actors have been endowed by the state with governmental powers or functions to such an extent that they were considered in essence agencies or instrumentalities of the state and consequently subject to constitutional limitations. *See, for example:* Railway Employees' Department v. Hanson, 351 U.S. 225, 76 S.Ct. 714, 100 L.Ed. 1112 (1956) (federal authorization of union shop agreements); Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) (state elective process delegated to private group); Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948) (restrictive covenants enforced through judicial action); Simkins v. Moses H. Cone Memorial Hospital, 323 F.2d 959 (4th Cir. 1963), cert. denied, 376 U.S. 938, 84 S. Ct. 793, 11 L.Ed.2d 659 (1964) (hospital receiving federal aid); Eaton v. Grubbs, 329 F.2d 710 (4th Cir. 1964) (hospital receiving no federal aid but regulated by the state).

The courts which have considered the question of whether a utility company is acting under color of state law when it terminates service to an individual customer for alleged nonpayment of bills have not been unanimous in their conclusions. Although most courts have found state action because the utility company was subject to pervasive state regulation and because the private activity in question was essentially a governmental function, Bronson v. Consolidated Edison of New York, 350 F.Supp. 443 (S.D.N.Y.1972); Ihrke v. Northern States Power Co., 459 F.2d 566 (8th Cir.) vacated as moot, 409 U.S. 815, 93 S.Ct. 66, 34 L.Ed.2d 72 (1972); Stanford v. Gas Service Co., 346 F.Supp. 717 (D.Kan.1972); Hattell v. Public Service Co., 350 F.Supp. 240 (D.Colo.1972), other courts have declined to find state action even in the presence of pervasive

Utility Service for Nonpayment: A Plight of the Poor, 46 Wash.L.Rev. 745 (1971); Note: The Duty of a Public 

Utility to Render Adequate Service, 62 Colum.L.Rev. 312 (1962).

regulation because the state was not involved in the particular activity complained of, Lucas v. Wisconsin Electric Power Co., 466 F.2d 638 (7th Cir. 1972); Jackson v. Metropolitan Edison Co., 348 F.Supp. 954 (M.D.Pa.1972).

■ However, reliance upon these precedents cannot be dispositive of the issue before us since the significance of the involvement of the state in the actions of any kind of private conduct can only be determined by an examination of the facts of each particular case, which is seldom an easy task. *Burton, supra,* 365 U.S. at 722, 81 S.Ct. 856. Accordingly, we must examine carefully the particular circumstances under which the Columbia Gas Company operates in general, paying particular attention to the source and extent of the power invoked by the company when it terminates or threatens to terminate utility service for nonpayment of bills.

■ Because the District Court based its finding of state action upon the fact that the termination procedure of the company was taken pursuant to a state statute which specifically authorizes natural gas utility companies to enter the premises of a customer following 24 hours notice, we will first consider whether the state has sufficiently involved itself in the particular activity complained of to justify this finding. This statute provides:

"If any person supplied with gas neglects or refuses to pay the amount due for such gas or for rent of articles hired by him from the gas company, the company may stop the gas from entering the premises of such person. In such cases, after twenty-four hours' notice, the officers, servants, or workmen of the gas company may enter the premises of such parties, between eight a. m. and four p.

m., take away such property of the company, and disconnect any meter from the mains or pipes of the company. The company shall not refuse to furnish gas on account of arrearages due if for gas furnished to former occupants of the premises." O.R.C. § 4933.12.

The statute does not authorize a breach of the peace. Should the resident object or prevent the employees of the company from entering the premises to terminate gas under this section, the company has at its disposal § 4933.10 O.R.C., which provides that in the event that a person prevents or hinders an employee of the company from entering the premises of a utility customer to remove equipment, the company may secure from a judge of a county or municipal court a warrant directing any constable [13] of the municipality to accompany the employee to the premises to aid him in gaining entry for the removal or inspection of the company's equipment. No provision is made for informing the resident that this procedure is beng invoked, nor is any provision made for hearing the resident's arguments. The company need only state to the judge the facts of the case based upon the knowledge of a company officer or employee; it need not assert that the bill is just or that it has been accurately computed. The availability of this ex parte procedure endows the company with a forceful police power for entry into a private home not generally possessed by creditors.

■ The company's basic contention on this appeal is that its actions in terminating service for nonpayment of bills are the normal actions taken by a common law creditor and therefore cannot be considered state action. Although the company acknowledges that its termination practice has been codified by statute and by regulation,[14] it contends

13. Statutory authority under U.C.C. § 9–503 to repossess property without a breach of the peace has been found to constitute state action, even though no officer was involved in the repossession

process. Adams v. Egley, 338 F.Supp. 614, 618 (S.D.Cal.1972).

14. State action may be premised upon rulings and regulations of administrative or

that its actions in this regard are not taken under color of law because the codification has not enlarged the utility's common law right. Even assuming for the moment that the statutes and regulations in questions are essentially codifications of pre-existing common law rights, a fact which is not conceded by the plaintiffs, the company's argument remains unpersuasive for several reasons.

First of all, this rationale has been rejected by the Supreme Court. In Reitman v. Mulkey, 387 U.S. 369, 87 S. Ct. 1627, 18 L.Ed.2d 830 (1967), the "open housing" case, the Court considered an argument that an amendment to the California Constitution which prohibited government restriction of the right to convey real property merely codified the rights of private citizens long recognized by common law. The Court held that regardless of the source of the rights or privileges embodied in the amendment, state action would be present during any enforcement of the amendment because the amendment authorized, encouraged and enforced actions which violated the Constitution of the United States. 387 U.S. at 376, 87 S.Ct. 1627. *See also Burton, supra,* 365 U.S. at 722, 81 S.Ct. 856. The source of the power is irrelevant when the consequence of the grant enables private citizens to act in derogation of the Constitution. If a direct grant of power from the people to the government, a constitutional amendment, can be held to constitute state action, it would follow that less direct, legislative embodiments of the public will in the form of statutes can be similarly considered actions of the state. Statutes, ordinances and regulations which codify the common law are no less actions of the state than are laws which create new offenses, restrictions or regulations, or which otherwise alter the common law.

Secondly, the common law pertaining to the relations between a creditor and his debtor is premised upon an open market where economic competition and freedom of contract serve to equalize the bargaining power of the parties; its application to a closed market where the customer cannot turn elsewhere to purchase the services or products offered is at best questionable. In no sense of the phrase can the appellant company be considered a free market competitor. First of all, it has no competitors, and we cannot disregard the effect which the company's monopolistic character has upon its relationship with its customers. The company enjoys a monopoly in the city of Toledo, and elsewhere, and the service provided is a necessity of life to most, if not all, of its customers. When a privately owned company enjoying a monopoly is in the business of providing a necessity of life it cannot, for purposes of evaluating its relationship to its customers and to the state in which and under whose control it operates, be considered as an independent, free market, common law competitor.

Circumstances may vary, but the principal remains constant. In 1895, the Supreme Court of Maine considered the question of whether a water company could terminate service for the nonpayment of an old, overdue, disputed bill after having accepted payment for a subsequent installment. In holding that the company could not terminate service under these circumstances, the Court made observations on the necessity of the service and the relative strengths of the parties:

> "The parties are not upon equal ground. The city, as a water company, cannot do as it will with its water. It owes a duty to each consumer. The consumer, once taken on to the system, becomes dependent on that system for a prime necessity of business,

regulatory agencies, as well as upon legislative or judicial action. Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 179, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). It is noted, however, that the points of difference in

that equal protection case dealing with a private club exceed in significance and in number the points of similarity to this due process case dealing with a public utility company.

comfort, health, and even life. He must have the pure water daily and hourly. To suddenly deprive him of this water, in order to force him to pay an old bill claimed to be unjust, puts him at an enormous disadvantage. He cannot wait for the water. He must surrender, and swallow his choking sense of injustice. Such a power in a water company or municipality places the consumer at its mercy. It can always claim that some old bill is unpaid. The receipt may have been lost, the collector may have embezzled the money; yet the consumer must pay it again, and perhaps still again. He cannot resist, lest he lose the water." Wood v. City of Auburn, 87 Me. 287, 292–293, 32 A. 906, 907–908 (1895).

■ Virtually every aspect of this company's operations are subject to the dictates of state statute or to the regulation [15] of the Public Utilities Commission of Ohio (P.U.C.O.). In addition, the city of Toledo also regulates the activities of the company through the provisions of the Toledo City Charter [16] which controls the power to fix rates and to grant franchises to privately owned public utilities for the provision of services to residents of the city.

■ The important factor is not the number of statutes and regulations which pertain to the operation of a utility company, but the extent to which the state has reserved power to control the operations of a public utility, and the amount of power given to the utility which is usually reserved to the state. The P.U.C.O. has general supervision over all public utilities in Ohio, and has the power to examine the general condition of utilities and to keep informed of their franchises, and their manner of leasing, operating, managing and conducting their properties with respect to the adequacy of service and safety to the public, as well as compliance with all laws, P.U.C.O. orders, franchises and charter requirements. O. R.C. § 4905.06. The P.U.C.O. may change the rules, regulations and practices of any utility after a hearing upon a complaint or upon its own initiative, and it may order modifications to be made. O.R.C. § 4905.37. An examination of the other statutes in Title 49 and in Chapter 743 of the Ohio Revised Code, as well as Sections 8, 157, 165, 221 and Chapter 12 of the Toledo City Charter reveals a total regulatory system controlling virtually every function of utility companies.

These controls notwithstanding, the state has granted to utilities powers not usually possessed by private corporations. For example, the utility company may exercise the power of eminent domain (O.R.C. § 743.39) with certain limitations (O.R.C. §§ 743.40–.41) an important power which historically is reserved to the sovereign. Green Street

---

15. Some of the more important chapters and sections of the Ohio Revised Code which pertain to the operation of a public utility company in Ohio include: Chapter 4901, Public Utilities Commission—Organization; Chapter 4903, Public Utilities Commission—Hearings (only the Supreme Court of Ohio has jurisdiction to review any action of the P.U.C.O., § 4903.12); Chapter 4905, Public Utilities Commission—General Powers; Chapter 4909, Public Utilities Commission—Fixation of Rates (including the ascertainment of the value of the utility's property, § 4909.04, and the power of P.U.C.O. to fix rates based on that valuation, § 4909.15); Chapter 4933, Companies—Gas; Electric; Water (giving the gas companies the power to manufacture, sell and furnish the gas required in a municipal corporation and to lay pipes through the streets with the consent of the municipal authorities, § 4933.01; mains may be extended beyond the city limits if a right of way is obtained from those controlling such property, § 4933.05); Chapter 743, Utilities—Electricity; Gas; Water (detailing the powers which a municipal corporation has over, and may grant to, a gas company).

16. Municipal ordinances adopted by state authority may constitute state action and are within the prohibition of the Fourteenth Amendment. Lovell v. Griffin, 303 U.S. 444, 450, 58 S.Ct. 666, 82 L.Ed. 949 (1938).

Ass'n. v. Daley, 373 F.2d 1, 6 (7th Cir.), cert. denied, 387 U.S. 932, 87 S.Ct. 2054, 18 L.Ed.2d 995 (1967); Garrow v. United States, 131 F.2d 724 (5th Cir.), cert. denied, 318 U.S. 765, 63 S.Ct. 664, 87 L. Ed. 1137 (1942); United States v. Federal Land Bank of St. Paul, 127 F.2d 505, 508 (8th Cir. 1942).

In addition, we must consider the fact that the furnishing of natural gas to the citizens of Ohio is a legitimate public function which itself has been held to satisfy the state action requirement; when a public function is performed by a private firm whose freedom of decision making has been restricted by governmental regulation and whose freedom of action has been severely circumscribed, the actions of the otherwise private firm become subject to the constitutional limitations placed upon state action. Food Employees Local 590 v. Logan Valley Plaza, 391 U.S. 308, 88 S.Ct. 1601, 20 L.Ed.2d 603 (1968); Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946); McQueen v. Druker, 438 F.2d 781 (1st Cir. 1971); Meredith v. Allen County War Memorial Hospital Commission, 397 F.2d 33 (6th Cir. 1968); Smith v. Holiday Inns of America, 336 F.2d 630 (6th Cir. 1964); Stanford v. Gas Service Company, 346 F. Supp. 717 (D.Kan.1972). When private individuals or groups are endowed by the state with functions or powers which are of a governmental nature, they become instrumentalities of the state and thus are subject to its constitutional limitations. Evans v. Newton, 382 U.S. 296, 299, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966).

In summary, inasmuch as the operations of the appellant company are fully circumscribed by an all-encompassing system of state statutes, city ordinances and the supervision of the state regulatory authority, and inasmuch as the state of Ohio is significantly involved in virtually every one of the company's activities, including the specific activity complained of, the conclusion that the regulatory activities of the state have insinuated it into a position of interdependence with the company so that it must be recognized as a joint participant with the company is inescapable. *Burton, supra,* 365 U.S. at 725, 81 S.Ct. 856.

III

DUE PROCESS

We now turn to the company's contention that its present practices satisfy the requirements of due process. Like the state action issue, the question of what constitutes due process of law can only be answered in relation to the circumstances of each particular case; due process varies with the subject matter and the requirements of each situation. Fuentes v. Shevin, 407 U.S. 67, 82, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). "[T]here is no table of weights and measures for ascertaining what constitutes due process." Burns v. Wilson, 346 U.S. 137, 149, 73 S.Ct. 1045, 1052, 97 L.Ed. 1508 (1953).

In considering the kinds of due process protection that might be afforded in any given case, the nature of the affected interest, the manner in which it has been adversely affected, the reasons for which it was affected and the viable alternatives to the challenged procedure must be considered, and the injury complained of must be balanced against the good to be accomplished. Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 163, 71 S.Ct. 624, 95 L.Ed. 817 (1951). " 'Due process' is, perhaps, the least frozen concept of our law—the least confined to history and the most absorptive of powerful social standards of a progressive society." Griffin v. Illinois, 351 U.S. 12, 20–21, 76 S.Ct. 585, 591, 100 L.Ed. 891 (1956) (concurring opinion of Mr. Justice Frankfurter). The due process clause requires, as a minimum, that parties whose rights are to be affected are entitled to be notified of the proposed action, and they are entitled to be heard.

Baldwin v. Hale, 68 U.S. 223, 233, 1 Wall. 223, 17 L.Ed. 531 (1863). It is equally fundamental that the right to notice and to the opportunity to be heard must be granted at a meaningful time and in a meaningful manner. Armstrong v. Manzo, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965). We will first discuss the adequacy of the company's notice procedure.

## IV

### NOTICE

The company contends that its existing procedures of notifying customers of a proposed termination of service satisfy the requirements of the due process clause of the Fourteenth Amendment. The computer-issued shut-off notice, aside from dates, dollar amounts, account numbers and addresses, informs the customer that his account is past due, and that unless the past due amount is paid, or unless "satisfactory arrangements" are made with the company, the customer's service will be terminated without further notice. He is instructed to pay the past due amount at the local office, and is alerted to the fact that the company's servicemen and collection agencies are not authorized to accept such payments.

■ The company serves 140,000 customers in the Toledo area, and although the company's computer issues between 120,000 and 140,000 of these notices per year, only about 4% of them are followed by actual terminations.[17] In addition, the company instructs customers to disregard these notices whenever special arrangements for installment payments have been made.[18] Notice must be one which is designed to actually inform the consumer of the proposed termination of service, and the reason for the proposed termination; it

must be given sufficiently in advance to permit him adequate opportunity to prepare for and to be present at the hearing. Cf. Mullane v. Central Hanover Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); Roller v. Holly, 176 U.S. 398, 20 S.Ct. 410, 44 L.Ed. 520 (1900).

■ The company's shut-off notice does not provide the customer with the information he needs to quickly and intelligently take available steps to prevent the threatened termination of service. No mention is made in the notice of the fact that a dispute concerning the amount due might be resolved through discussion with representatives of the company, nor is notice given to a customer that special payment programs are available for a customer whose unexpectedly large bill is the result of, among other things, a series of computer underestimates. The single reference to making "satisfactory arrangements" cannot be construed as informing a customer of his right to continued service pending a hearing if he disputes the accuracy of the bill or the propriety of the shut-off notice. In fact, the company's district office manager conceded on cross-examination that the notice does not inform the customer of any rights whatever. In short, the company's termination notice is, in the context of constitutional law, virtually no notice at all. "But when notice is a person's due, process which is a mere gesture is not due process." Mullane, supra, 339 U.S. at 315, 70 S.Ct. at 657.

The company argues that the personal notice requirement required by the order of the District Court is an unreasonable imposition upon the gas company. We disagree for several reasons. First, it is clear that the flood of final notices sent out by the company was, as the District Court expressed it, "a wolf kind of

17. During December 1971, about 9,000 final notices were issued and about 400 actual terminations were made.

18. One plaintiff testified that, after special arrangements had been made for the payment of her bill, she received a shut-off

notice every month accompanied by another notice requesting her to disregard all other notices. Her gas service was suddenly terminated, apparently in accordance with one of the notices she had been instructed to disregard.

notice"[19] which does not conform to the constitutional requirements that notice be truly informative and be given at a meaningful time. In addition, the fact that several witnesses testified that they were told by the company to disregard the notices is an additional persuasive factor which supports the District Court's requirement that the company personally contact a resident of the premises prior to actual termination.

The notification required by the District Court's order does not preclude an attempt by the company to contact the customer to ascertain the reason for nonpayment and to determine whether in fact a dispute exists. If there is a dispute, the hearing procedure can come into play and obviate the need for personal notification, which is only required when the company has proceeded to the stage of actual termination of service. The reasonableness of any notice procedure must be considered in the light of the circumstances of each particular case. Boddie v. Connecticut, 401 U.S. 371, 380, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); *Mullane, supra;* Covey v. Town of Somers, 351 U.S. 141, 76 S.Ct. 724, 100 L.Ed. 1021 (1956). Balancing the potential harm to the customer against the inconvenience to the gas company, we cannot say that the notice requirement as established by the order of the District Court is unreasonable or an abuse of discretion.

## V

### HEARING

"[W]hen a person has an opportunity to speak up in his own defense, and when the State must listen to what he has to say, substantively unfair and simply mistaken deprivations of property interests can be prevented." *Fuentes, supra*, 407 U.S. at 81, 92 S.Ct. at 1994.

The highly computerized collection and termination practices of the company are governed by a singular corporate concern for efficiency and protection of assets. However, the Due Process clause was designed to protect the rights of the citizens from procedures which often serve more to insulate the state from individuals than to serve their needs. The Constitution recognizes higher values than speed and efficiency. Stanley v. Illinois, 405 U.S. 645, 656, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).

Several factors militate against acceptance of the company's argument that its informal hearing procedures, essentially through the office of its "Urban Affairs Coordinator," satisfy the requirements of due process. Foremost is the fact that the company has no established procedure for resolution of disputes arising from collection and termination activities, nor is there any established procedure for negotiation of partial payment of delinquent accounts in lieu of termination. Appeal to the Urban Affairs Coordinator is an informal procedure of which the customer is not informed, either before or after a dispute arises. The Company's notice contains no indication that somewhere within the company's internal framework there lies a procedure which permits a customer to be heard on his complaint. The services of the Urban Affairs Coordinator are available only to those customers who happen to know about them because no advertising of

19. In rendering his decision from the bench, the District Judge explained his reasoning:

"Several thousand years ago, I believe there was a writer who told the story about a boy who thought he would cause excitement by crying that the wolf was attacking his flock of sheep. It did cause excitement, but since no wolf was attacking, after he had stirred up excitement a couple of times, when the wolf really did attack nobody paid any attention to him. So that what we have here is a wolf kind of notice that is very convenient for the computer to issue, but is not, I think, what the statute [O.R.C. § 4933.12] contemplates, which, in my interpretation, is a meaningful notice that applies to the person who is going to be affected by it and will be followed by some action."

any kind has been utilized by the company to inform its customers of his services, and because the company's employees are not instructed to inform customers of this service. More importantly, in no case does the customer have the right to appeal through the Urban Affairs Coordinator, nor does he have the right to continued service pending the disposition of his grievance. The company's argument that its existing procedures satisfy minimal due process requirements is in essence an attempt to substitute an unsupported assumption of corporate good faith for the guarantees of the due process clause of the Constitution. The mere theoretical possibility of informal resolution cannot serve as a substitute for a mandatory procedural mechanism designed to prevent unjust deprivations of important property interests. "The right to a fair and open hearing is one of the rudiments of fair play assured to every litigant by the Federal Constitution as a minimal requirement." Railroad Com. v. Pacific Gas Co., 302 U.S. 388, 393, 58 S.Ct., 334, 338, 82 L.Ed. 319 (1938).

■ On the other hand, we conclude that the hearing procedures imposed by the order of the District Court are not unreasonable under the circumstances. The fact that gas service, at least in the context of this case, is a necessity in the ultimate sense that one's life may depend on it [20] goes not toward the question of whether due process attaches but to what type of procedure should be constructed to ensure that one is not wrongfully deprived of its use. Joint Anti-Fascist Refugee Committee v. McGrath, *supra*. Since uncontradicted evidence was introduced from which the District Court concluded that the company's clerical employees were "hostile, arrogant, and unyielding in dealing with consumers," [21] 342 F.Supp. at 243, the District Court ordered that a personal hearing be conducted by an employee in a management position, in order to remove the collection-oriented and clerical employees from the decision making procedure. The protection of the individual from the sudden, unexpected and catastrophic consequences of the company's termination procedures is an interest which outweighs any possible loss the company might suffer in complying. If the past due amount is rightly owed, the company has an adequate remedy at law. Any gas consumed pending a pre-termination hearing will be minimal, and must be paid for by the customer.

The company contends that legal remedies are available to the recipient whose service is unjustly terminated. This argument is unpersuasive for several reasons. First, as noted above, during the pendency of such litigation, the customer would be deprived of the use of the gas service.[22] Secondly, placing

---

20. The District Court found that gas utility service is a necessity of life, the deprivation of which can cause serious emotional and physical damages, especially in Northwestern Ohio in the dead of winter. "A person can freeze to death or die of pneumonia much more quickly than he can starve to death." 342 F.Supp. at 244.

21. For example, one witness testified that her gas service was terminated on the day before the due date on the bill; when she inquired of the company representative why she had received no shut-off notice, "she said it was tough." Gas service was not restored to this witness even though the bill was paid in full on the due date, January 13. The entire home was "completely iced over," several windows broken from the cold and water pipes froze and cracked. The witness, her husband, and her children of eleven months and seven years were unable to live in the house during this time. When she called the company she was informed that they did not know when her service would be reconnected because they did not make preferences. When she informed the company representative that she had with her an eleven month old baby, the representative told her to run around to keep warm.

22. *See* City of Mansfield v. Humphreys Manufacturing Co., 82 Ohio St. 216, 92 N.E. 233 (1910), which held that a suit for damages by a consumer whose water service is wrongfully terminated is an inadequate remedy in the absence of an injunction prohibiting termination until the amount due is ascertained and assessed against the party at fault.

such a burden upon the customer to justify or to explain nonpayment of a bill would be violative of the principle that the one asserting something to be due him shall have the burden of legal action and proof. Wood v. City of Auburn, 87 Me. 287, 293, 32 A. 906, 908 (1895). Thirdly, moderate and low income families, whose service is most likely to be terminated for nonpayment[23] are those who will be least likely to be familiar with or to be able to afford the costs of civil litigation.[24] It is simply not realistic to assume that anyone who disputes the gas company has the full arsenal of legal remedies available to him; as a practical matter, disputes concerning such relatively small sums are seldom brought to litigation. *Lucas, supra,* 466 F.2d at 650; 340 O.St.L.J. 222, 228 (1973); *see generally:* Shelton, The Shutoff of Utility Services for Nonpayment: A Plight of the Poor, 46 Wash. L.Rev. 745, 748–52 (1971).

In Fuentes v. Shevin, *supra,* the Supreme Court held that the sworn affidavit of a creditor stating that he is entitled to certain goods, accompanied by a bond to indemnify the debtor for wrongful seizure, could not substitute for the due process requirement of a prior hearing because the bare assertion of entitlement tested only the applicant's own belief in his rights. 407 U.S. at 83, 92 S. Ct. 1983. In *Fuentes,* the debtor was permitted to regain possession after seizure by posting a bond, and yet the Supreme Court found that this procedure did not comport with the requirements of due process because "[i]f the right to notice and a hearing is to serve its full purpose, then, it is clear that it must be granted at a time when the deprivation can still be prevented." 407 U.S. at 81, 92 S.Ct. at 1994. This minimal protection of the rights of the customer is lacking from the procedures presently employed by the company; the customer does not have the right to post a bond to receive continued service pending a final determination of his dispute. To correct this deficiency, the District Court's order permits the customer to post a bond so that he may receive gas service pending the outcome of litigation commenced by the company should the initial hearing by the company fail to resolve the dispute to the satisfaction of the parties. Similarly, the unsupported conclusory allegation of the company that the bill is past due, based upon the tacit assumption that the party was properly billed, cannot substitute for a procedure allowing the customer to be heard by someone who is in a position to mediate the dispute, and who is at least sufficiently removed from the internal corporate business and affairs which might prejudice a fair decision.[25]

In summary, the District Court's order, more than anything else, merely formalizes and makes available to every customer of the company informal procedures that the company asserts have always been available. We find no abuse of discretion in this determination.

## VI

Several arguments remain to be considered. First, the company contends that the District Court should have abstained from the exercise of jurisdiction in this case because a remedy was available to the plaintiffs by way of appeal to the Public Utilities Commis-

---

23. At least four of the plaintiffs and witnesses who testified at trial were receiving all or some of their support from a welfare system. Similarly, the plaintiff in *Bronson, supra,* was receiving welfare assistance from the Department of Social Services. 350 F.Supp. at 444–445.

24. Amicus Ohio State Legal Services Association asserts that Ohio's legal services programs, which serve only the destitute, operate in only 18 of 88 counties in Ohio.

25. Since no issue is raised concerning the connection of the hearing officers with the company, we may assume, at least for the moment, that the District Court's order satisfies the plaintiffs in this respect; since the plaintiffs have not moved for an amendment of the Court's order and have not appealed from it, we need not consider this question at this time, suggestions in the Amicus briefs notwithstanding.

sion of Ohio. Exercise of the abstention doctrine is purely discretionary, Holmes v. New York City Housing Authority, 398 F.2d 262, 266 (2d Cir. 1968), and cases involving vital questions of civil rights are the least likely candidates for abstention, Zwickler v. Koota, 389 U.S. 241, 247–248, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967); Wright v. McMann, 387 F.2d 519, 525 (2d Cir. 1967); Note, Federal-Question Abstention: Justice Frankfurter's Doctrine in an Activist Era, 80 Harv.L.Rev. 604, 607–08 (1967). In addition, review by the P.U.C.O. is discretionary since the Commission must first judge whether reasonable grounds exist to warrant a hearing. O.R.C. § 4905.26. We do not find that it was an abuse of the Court's discretion to refuse to abstain from taking jurisdiction of this important civil rights case on the grounds that the P.U.C.O. might, at some time in the future, decide to review a similar grievance.

■■■ The company also contends that the District Court's order was unreasonable in requiring the use of certified mail as a means of notifying customers of a proposed termination of service. The Court ordered that in the event the collector cannot make personal contact with a responsible adult member of the household, the service must be continued until at least 24 hours after the company's receipt of the return signifying that the customer has been notified in writing by certified mail of the company's intention to terminate service. As concluded above, the evidence showed that the company's practice of giving notice of its intention to terminate service was virtually no notice at all.[26] The evidence also showed that terminations were made without any effort to contact the individuals residing in the residence to be affected. A method of notification must be employed which will actually inform the customer of the company's intention. *Mullane, supra,* 339 U.S. at 315, 70 S.Ct. 652. In addition, the company must be assured that the customer has actually been notified so that, should the customer not notify the company during the 24 hour period,[27] the company may fairly assume that the customer acknowledges nonpayment and has no dispute concerning the propriety of the billing. In determining the constitutional adequacy of what purports to be notice in any given context, courts look to the practical realities of the circumstances of each particular case. *Mullane, supra,* 339 U.S. at 314, 70 S.Ct. 652. Since the certified mail requirement is not per se unreasonable, and since the District Court's order provides that it may be modified upon good cause shown by the company, we find that this part of the District Court's order does not constitute an abuse of discretion.

Finally, the company contends that this suit should not be permitted to be prosecuted as a class action because the requirements of Federal Rule of Civil Procedure 23 have not been met. Inasmuch as the class has not yet been specifically defined by the District Court, and inasmuch as the District Court continued this case for further hearing upon the scope of the class of plaintiffs, and inasmuch as interlocutory appeals pursuant to 28 U.S.C. § 1292 are limited to those questions certified by the District Judge, the issue of the propriety of maintaining this suit as a class action is not properly before this Court. Ex parte National Enameling & Stamping Co., 201 U.S. 156, 26 S.Ct. 404, 50 L.Ed. 707 (1906).

The judgment of the District Court is affirmed.

---

26. Sometimes it actually gave no notice at all. The original plaintiffs, Mr. and Mrs. Morris Palmer, testified that they received no shut-off notice whatsoever from the company and yet their service was terminated for a period of two days.

27. This period is counted from when the collector notifies an adult resident of the premises or from the time of the receipt by the company of the certification.