RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0146p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

MING KUO YANG; JULIE YANG,

        *Plaintiffs-Appellants,*

    *v.*

CITY OF WYOMING, MICHIGAN,

        *Defendant-Appellee.*

No. 14-1846

───────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:13-cv-00616—Robert Holmes Bell, District Judge.

Argued: March 4, 2015

Decided and Filed: July 13, 2015

Before: CLAY, GILMAN, and SUTTON, Circuit Judges.

───────────────

**COUNSEL**

**ARGUED:** Gaëtan E. Gerville-Réache, WARNER, NORCROSS & JUDD LLP, Grand Rapids, Michigan, for Appellants. Jack R. Sluiter, SLUITER, VAN GESSEL & CARLSON, PC, Wyoming, Michigan, for Appellee. **ON BRIEF:** Gaëtan E. Gerville-Réache, WARNER, NORCROSS & JUDD LLP, Grand Rapids, Michigan, for Appellants. Jack R. Sluiter, SLUITER, VAN GESSEL & CARLSON, PC, Wyoming, Michigan, for Appellee.

    SUTTON, J., delivered the opinion of the court in which GILMAN, J., joined. CLAY, J. (pp. 10–18), delivered a separate dissenting opinion.

───────────────

**OPINION**

───────────────

    SUTTON, Circuit Judge. For one reason or another, Ming Kuo and Julie Yang did not keep up their commercial property in Wyoming, Michigan. Neglect led to disrepair, which led

1

by all appearances to abandonment and the safety risks that go with it. The city tried to contact the couple about the necessary fixes, but to no avail. After the last of the notices, the city leveled the building. The Yangs noticed that development and filed this § 1983 action in response, alleging that the city failed to provide them with sufficient notice of the demolition. The district court granted summary judgment to the city, holding that the city provided all of the notice that was reasonably due. We affirm.

I.

The Yangs purchased the building in 1989, and over the years leased it to an assortment of restaurants. In late 2010, they listed the property for sale, and in February 2011 the last restaurant to lease the property closed.

The Yangs never managed to sell the building or find another tenant after February 2011. From then on, they neglected the property, though they continued to pay their property taxes on it. That lack of attention and brisk Michigan winters took their toll. So did the work of local bandits. The building "was vandalized," a city inspector said. R. 50-11 at 4. "Electrical wires were pulled out. The [water] meter had been stolen. . . . [T]he inspectors said ceiling fixtures were missing. Copper plumbing lines were cut out. All the kitchen equipment was gone." *Id.* "The roof was failing. The front columns that supported the canopy over the entryway were starting to lean out. . . . You could see in the windows that the ceiling pads were coming down, looked like due to water coming through the roof. . . . Plant[e]r boxes around the building were failing." R. 50-12 at 3. "The parking lot was . . . full of potholes" and littered with abandoned vehicles. *Id.*

In October 2011, city officials posted an abandonment notice on the "dilapidated" building and mailed a copy to the owner listed in its files. R. 50-6 at 3. The mailed notice went to the address of the abandoned building and mistakenly listed the previous owner (Joseph Gordon), not the Yangs, as the recipient. The city took no further action at that time other than to reinspect the property each month and ensure the abandonment notice remained on the building.

Nine months later (July 2012), the city condemned the lot by posting a "repair/demolish" notice on the building. R. 48-13 at 3. At the same time, the city also sent out two notices through a signature-required certified mailing: a "Notice and Order to Repair or Demolish," which said that the structure violates state or local building codes and warned that continued noncompliance could lead to "demolition," R. 48-9 at 2–3, and a "Notice of Posting," which detailed the property's shortcomings, R. 48-8 at 2. Once again, that mail went to the abandoned property's address and listed Joseph Gordon as the recipient.

Two months later, the post office returned the certified letter as unclaimed, "unable to forward," and addressed to a "vacant" building. R. 48-12 at 2. The city "did a title search," which "came up with a new owner of record": the Yangs. R. 48-14 at 4. Armed with the correct owner and the correct residential address of the owner, the city sent the Notice and Order to Repair or Demolish and the Notice of Posting by certified mail in September 2012 to the Yangs' home in nearby Grand Rapids.

By mid-October, the city had not heard from the Yangs. It scheduled a hearing about demolishing the property for November 1 and sent the Yangs a hearing notice by regular mail. The city also mailed a copy of the hearing notice to the Yangs' realtor.

Soon after these actions, the post office returned as "unclaimed" the certified mailing sent to the Yangs' home. The city did not resend the information contained in that mailing. That information, however, was already contained in material part in the regular, non-certified mailing that the city sent to the Yangs' home and that never came back to the city.

The November 1 hearing arrived, but the Yangs did not. The board approved the demolition, because it found "the property ha[d] not been maintained," "repairs would be expensive," and "[a] vacant lot would still be of value to the owner." R. 48-21 at 4. Afterward, the city sent another notice to the Yangs' home address by regular mail. This one informed the couple of the planned demolition and their right to appeal the board's order to state court. That letter too was not returned. Still no word came from the Yangs. In January 2013, the city razed the Yangs' property and mailed them a $22,500 bill for the work.

That got their attention.  Ming Kuo called the city's chief building inspector to see what had happened to the property.  According to the city, Ming Kuo said, "I remember getting the mail that said something about fixing up the building but I ignored it."  R. 51-3 at 4.  According to the Yangs, they "did not receive any notices or letters" telling them that "the [c]ity might demolish the[ir] building."  R. 48-2 at 4.

Rather than pay the demolition bill, the Yangs filed this § 1983 action in federal district court.  They claim that the city violated their procedural due process rights by destroying their property without adequate notice.  The district court granted summary judgment to the city.  *See Yang v. City of Wyoming*, 31 F. Supp. 3d 925, 931 (W.D. Mich. 2014).  The Yangs appeal.

II.

Before a state or local government may deprive an individual of a property interest, the Due Process Clause of the Fourteenth Amendment requires it to provide "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).  A city like Wyoming must supply notice through means that "one desirous of actually informing the absentee might reasonably adopt."  *Id.* at 315.  "The Constitution . . . judges the adequacy of notice from the perspective of the sender, not the recipient," *Lampe v. Kash*, 735 F.3d 942, 944 (6th Cir. 2013), which means that the individual recipient's lack of due diligence will not negate otherwise reasonable efforts at notice, *see Karkoukli's, Inc. v. Dohany*, 409 F.3d 279, 285–86 (6th Cir. 2005).

Notice mailed to a person's home address generally satisfies due process.  *See Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 800 (1983).  But what happens if local officials send notice through signature-required certified mail and the letter is returned unclaimed, as happened here?  The government's response, as with any attempt at providing notice, must be "reasonable" under the "particular circumstances."  *Tulsa Prof'l Collection Servs., Inc. v. Pope*, 485 U.S. 478, 484 (1988).  When unclaimed certified mail represents the government's first attempt at notice, for example, it must take "additional reasonable steps" to notify the interested party.  *See Jones v. Flowers*, 547 U.S. 220, 234 (2006).  No set-in-stone formula solves the problem of unclaimed

certified mail, but posting notice or sending it by regular mail generally will do the trick.  *See id.* at 234–35.

In this instance, the city made four *other* attempts to reach the Yangs on top of the certified mail it sent to the couple's home address.  Taken together, these efforts were "reasonably calculated" to give notice to the Yangs.  *See Jones*, 547 U.S. at 229.

1. *The posted notices.*  The city began posting abandonment notices on the Yangs' building in October 2011 and kept them there through January 2013, when it razed the building. Posting notice is "a singularly appropriate and effective way of ensuring that a person is actually apprised of proceedings against him."  *Jones*, 547 U.S. at 236 (ellipses omitted).  It is also "a significant act.  The local officials must get out of the office, find the property, and put a notice up for all to see."  *Karkoukli's*, 409 F.3d at 286.  The record does not say what the initial notice said, but by July 2012 at the latest—four months before the November hearing—the city began posting "repair/demolish" notices on the property.  R. 48-13 at 3.  Although the record does not contain copies of these notices (the building was destroyed after all), these city notices generally say that a "structure[] was found to be a Dangerous Building within the context of the [Wyoming City] Code" and that failure to return the building to "complete compliance" may result in "demolition."  R. 48-15 at 2–3.  But whatever the specific contents of the posted "repair/demolish" notices were, the city had ample reason to think that the Yangs, like any reasonable property owners (and especially reasonable property owners who live nearby), would find the notices relating to "repair[s]" and "demoli[tion]" on their property.  *Id.*  "[I]n most cases, the secure posting of a notice on the property . . . offer[s] that property owner sufficient warning of the pendency of proceedings possibly affecting his interests."  *Greene v. Lindsey*, 456 U.S. 444, 451 (1982).

2. *The hearing notice.*  The city also sent the Yangs a letter about the demolition hearing by regular mail.  That letter gave the Yangs a good deal of information.  It came from the city's "Building Inspections Department" and listed the property's address in the subject line.  R. 48-20 at 2.  The letter thus alerted the Yangs to the inspection-related problems with the property.  And it alerted them that the city would conduct a hearing about an alarm-bells topic:  a "Notice to Repair or Demolish the structure(s)."  *Id.*  The notice also mentioned chapter 10 of the Wyoming

City Code, which explains the reasons why the city would deem a building "dangerous" and thus subject to "demolition." Wyoming City Code §§ 110.1–.2. The letterhead contained "an address, phone number, and website with which to obtain more information" about the hearing too. *See Gooch v. Life Investors Ins. Co.*, 672 F.3d 402, 424 (6th Cir. 2012) (quotation omitted); *see also Herrada v. City of Detroit*, 275 F.3d 553, 559 (6th Cir. 2001).

3. *The realtor's hearing notice.* The city also forwarded the hearing notice to the Yangs' realtor. As the district court noted, sending the notice to the realtor was not a "mere gesture." *Yang*, 31 F. Supp. 3d at 930. The return of the certified mail meant one of two things: Either the Yangs refused to accept mail that would put them on notice of the consequences of neglecting their property, or they no longer lived at the Grand Rapids address. Rather than assume the former (which might have been understandable under the circumstances), the city acted based on the latter. Contacting the realtors of a property owner is a reasonable way to contact the owner— indeed an eminently intelligent and good faith way—as the realtor would be a likely source of the owner's contact information.

4. *The post-hearing notice.* Even after all of this, the city did not demolish the Yangs' building as soon as the hearing ended. It sent the Yangs another notice by regular mail. It informed the couple that the board had "affirmed the City's Notice and Order to Demolish" and that, if no appeal to county court was filed within thirty days, the city's contractors would "remove the structure" from the property "at their earliest convenience." R. 48-22 at 2. Post-hearing notice alone may satisfy due process so long as the interested party still has another meaningful opportunity for a hearing. The subsequent hearing "cure[s]" any lack of notice about the initial hearing. *See McKinney v. Pate*, 20 F.3d 1550, 1557, 1562–64 (11th Cir. 1994) (en banc)*; see also In re Tidwell*, 295 F.3d 331, 334 (2d Cir. 2002). What matters is that the Yangs have an opportunity for a fair pre-demolition hearing, and the state-court appeals process would have provided one. After sending the post-hearing notice to their accurate residential address, the city waited to hear from the Yangs for two more months before demolishing the property. All of these forms of notice considered, the city satisfied due process before tearing down a building that even the Yangs do not deny was dangerous and dilapidated.

The Yangs deploy a divide-and-conquer approach in attacking this conclusion. Posted notice by itself does not suffice, they say; the hearing notice taken alone did not contain the city's reasons for demolishing the property; and the post-hearing notice as the sole form of notice would have come too late. But that is not the way this works. The question is whether the city's many notice efforts amounted in the aggregate to a reasonable effort to apprise the Yangs of what was going on. Lest we forget, the city mailed the Yangs all of the information they needed to their home address by certified mail. That step by and large satisfied the city's initial due process responsibilities. *See Tulsa*, 485 U.S. at 490; *Schluga v. City of Milwaukee*, 101 F.3d 60, 62 (7th Cir. 1996). After the certified mailing came back unclaimed, the city needed to respond reasonably to the failure. *See Jones*, 547 U.S. at 229. But neither *Jones* nor any other case holds that the city acts *un*reasonably simply because its subsequent responses would not—each by themselves—independently satisfy due process, as the Yangs seem to think.

Nor would that make sense. Reasonableness inquiries occur case by case, circumstantially, and above all with attention to all that the government has done. So considered, the city's responses to the returned certified mail were reasonable. One response was to rely on the hearing notice sent by regular mail. Another was to keep "repair/demolish" notices posted on the property. (Who by the way does not look at their property when it is located nearby for more than fourteen months?) And another was to give post-hearing notice of their appeal rights and of the impending demolition if they do nothing. All that was missing is actual notice—expressly acknowledged by the Yangs. But that is not the test, as all agree. At some point, the question must turn from how often—and in how many forms—notice is due to how many times the property owner neglects to respond with the diligence that is due. Either way, the city satisfied its reasonableness requirements.

Nor does it make a difference that the regular mail notice—mailed after the certified mail was sent—did not give the reasons for a potential demolition. The reason turns again on the nature of the inquiry—an aggregate consideration of what was done. To see why, imagine that the city, after learning that the Yangs had not claimed the certified mail, sent them a letter by regular mail saying: "We sent you a notice by certified mail stating that we plan to demolish your property, but it came back unclaimed. Please call us at (phone number) so that we can

provide you with the necessary information." Would we say the city's effort was unreasonable because the follow-up notice did not *itself* include the reasons for the demolition? Of course not. Recall that the city had already sent the reasons for the demolition by certified mail. Yes, the Yangs did not get them, but the point turns on reasonable efforts to provide notice, not notice actually received. Notice to call the city would make up for the failed certified mail because it would give any reasonable person a means to learn about the demolition. "Whatever is notice enough to excite attention and put the party on his guard and call for inquiry, is notice of everything to which such inquiry may have led." *Espinosa v. United Student Aid Funds, Inc.*, 553 F.3d 1193, 1203 (9th Cir. 2008), *aff'd*, 559 U.S. 260 (2010). That in essence is just what happened here. Here is what the regular-mail notice said: "Re: 2675 28th St. S.W. [the address of the Yangs' building] Please take notice that a hearing shall be held" at "a meeting of the Wyoming Housing Board of Appeals . . . . regarding the City's Notice to Repair or Demolish the structure(s), in conformity to Chapter 10 of the Code of the City of Wyoming." R. 48-20 at 2.

The dissent claims that the Yangs' "behavior has no bearing whatsoever" on whether the City's notice was adequate to satisfy due process. *Ante* at 16. That is true in one sense: We will not excuse unreasonable notice on the ground that a more responsible property owner might have found out about the planned demolition on his own. But it is not true in another sense: That the Yangs chose (apparently) not to visit their property for fourteen months or chose (apparently) not to open their mail does not diminish the city's reasonable efforts at providing notice. "The law expects at least some diligence from the property owner," *Karkoukli's*, 409 F.3d at 286, and that reality necessarily affects how courts gauge reasonable efforts. We know of no case—and neither the Yangs nor the dissent have cited one—in which a city made so many attempts to provide notice and yet was still found to violate due process.

The Yangs add that we should ignore the notice posted on the abandoned building and pretend it never happened—because that piece of paper (presumably destroyed with the building) never made it into the record. But the city's building-code enforcement log states that a city official "posted" a "repair/demolish" order on the building in July 2012. R. 48-13 at 3. And the Yangs have no contrary evidence. On this record, the Yangs cannot deny that such a notice was posted. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Yangs also make much of the city's initial notice attempts, which were sent to the address of the building and identified the recipient as the prior owner.  But defective notices like these are irrelevant to the inquiry, so long as the city's later efforts were "reasonably calculated" to provide notice—which they were.

For these reasons, we affirm.

---------

**DISSENT**

---------

CLAY, Circuit Judge, dissenting.    Today the majority relies on assertions that are unsupported by the record, misconstrues the question presented, and ignores circuit precedent, all in effort to justify diluting the requirements of procedural due process so that they can find against plaintiffs whom they do not consider particularly sympathetic.  Because the uncontested facts demonstrate that the City's efforts to notify the Yangs do not pass constitutional muster, I respectfully dissent.

I.

This case is before us after both parties moved for summary judgment and the district court ruled in the City's favor.  When faced with cross-motions for summary judgment, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *B.F. Goodrich Co. v. U.S. Filer Corp.*, 245 F.3d 587, 592 (6th Cir. 2001) (internal quotation marks omitted).

A more accurate and complete statement of the factual background of this case is necessary in order to highlight the unsubstantiated facts relied upon by the majority to justify the demolition of the Yangs' property.

Ming Kuo and Julie Yang have owned the commercial space located at 2675 28th St. S.W., Wyoming, Michigan 49519 (the "property") for more than twenty-five years.  The building on the property housed a succession of restaurants until the most recent one went out of business in February 2011.  By that time, the Yangs had already listed the property for sale with a realtor.

A city inspector visited the property in October 2011.  The inspector documented a number of ordinance violations, characterized the property as abandoned, and posted an abandoned structure notice somewhere on the property.  (Presumably the property was in fine shape eight months prior when it was licensed as a restaurant serving the City's residents and

visitors.)   Within days of the inspection, the City erroneously mailed an abandoned structure notice to a prior owner, Joseph Gordon, at the property's address.

Thereafter, the City dispatched inspectors to examine the property on a monthly basis. During the July 2012 inspection, a municipal employee determined that the structure on the property met the definition of a "Dangerous Building" under the City Code, and posted a "repair/demolish" notice somewhere on the property.[1]  R. 48-13 at 3.  There is no indication in the record as to where on the grounds the notice was posted, nor is there anything in the record detailing the substance of the notice.  The majority claims to know what these types of posted notices "generally say," but the record entry cited is an entirely separate mailed notice that the Yangs never received.  Op. at 5 (citing R. 48-15 at 2–3).

In September 2012, the City realized that the repair/demolish and posting notices had been erroneously mailed to the prior owner, so it resent both notices by certified mail to the Yangs' residence in Grand Rapids, Michigan.  Among other things, the notices advised that an inspection was made and, as a result of the inspection, the structure on the property was determined to be a "Dangerous Building" as defined by the City Code.  R. 48-15 at 2.  The notices also identified the specific provisions of the Code that the structure violated, indicated that the violations had to be corrected or the structure demolished by October 12, 2012, explained that the order was appealable, advised that the Yangs should inform the City whether they intended to comply with the order, and identified the consequences of a failure to comply. However, the Yangs never received this correspondence; the post office subsequently returned the September 2012 notices to the City as "return to sender" "unclaimed" "unable to forward." R. 48-19 at 2.

In October 2012, the city mailed notice of a November 1, 2012 hearing before the City Board of Housing Appeals regarding the property.  The letter was sent to the Yangs at their home address by regular mail.  The post office did not return this October 2012 letter.

---

[1]Later that same month, the City sent a repair/demolish notice and a posting notice to Joseph Gordon at the property address by certified mail.  The United States Postal Service returned both notices as "unable to forward" and "vacant."  R. 48-12 at 2.

At the hearing on November 1, 2012, James DeLange, the Chief Building Inspector, informed the Board of Housing Appeals that the September 2012 certified letter sent to the Yangs had not been claimed. He explained that the building had been vacant for more than a year, had structural damage, and was otherwise dilapidated. He also informed the Board that the Yangs were paying the taxes on the property. The Yangs were not present at this hearing. Nonetheless, the Board of Housing Appeals approved demolition of the building.

Less than a week after the hearing, the City sent a letter to the Yangs by regular mail stating that the Board of Housing Appeals had affirmed the City's order to demolish the building. The post office did not return this letter to the City.

After the November 1, 2012 hearing, the City solicited bids for demolition of the building. The contract was awarded to the lowest bidder, and the structure and parking lot were razed in January 2013. The Yangs were alerted to the demolition by a phone call from a business acquaintance who happened to be passing by the property and was surprised that it was being leveled.

The Yangs filed suit in June 2013, alleging that the City violated their constitutional right to procedural due process when it failed to provide adequate notice and afford an opportunity to be heard prior to the bulldozing of the property. At the close of discovery, the parties filed cross-motions for summary judgment, and the district court ruled in the City's favor. The Yangs ask us to reverse.

## II.

This case is about procedural due process, the basic tenets of which are well-known. "[P]rior to an action which will affect an interest in life, liberty, or property protected by the Due Process Clause of the Fourteenth Amendment, a State must provide 'notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.'" *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 795 (1983) (quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). The Yangs challenge the content of the City's notices and the means

by which the notices were transmitted.  Because the content of the notices that the Yangs presumably received are either unknown or plainly insufficient, I would reverse the district court.

"Notice must be one which is designed to actually inform the [interested party] of the [potential deprivation], and the reason for [it.]" *Palmer v. Columbia Gas of Ohio, Inc.*, 479 F.2d 153, 166 (6th Cir. 1973).  If the interested party is not informed prior to the hearing of the reason for the proposed deprivation, the opportunity to be heard and present objections is rendered illusory.  *See Transco Sec., Inc. of Ohio v. Freeman*, 639 F.2d 318, 324 (6th Cir. 1981) ("Without a clear understanding of at least some of the facts which comprised the grounds for [the impending deprivation], the opportunity to present information is a meaningless one."); *Eaton v. Charter Twp. of Emmett*, 317 F. App'x 444, 448 (6th Cir. 2008) (explaining that "the general notice and hearing requirements imposed by the Due Process Clause" include "a reasonably definite statement of the charge or charges against [the interested party]" so that he can "appear [at the hearing] and offer any objections"); *cf. Brody v. Vill. of Port Chester*, 434 F.3d 121, 130 (2d Cir. 2005) ("notice must . . . convey the required information" and "*Mullane* [*v. Central Hanover Bank & Trust Co.*] requires *as much notice as is practicable* to inform a condemnee of legal proceedings against his property" (emphasis added) (internal quotation marks omitted)).

The content of the September 2012 notices sent to the Yangs' residence appear to satisfy the Fourteenth Amendment's notice requirement.  It advised of the threatened action, the reasons for it, and how it could be contested. Unfortunately for the City, these notices were returned as unclaimed.  And "when mailed notice . . . is returned unclaimed, the [government] must take additional reasonable steps to attempt to provide notice to the property owner." *Jones v. Flowers*, 547 U.S. 220, 225 (2006).

The majority holds that the posted October 2011 abandoned structure notice, the posted July 2012 order to repair/demolish, the October 2012 hearing notice sent by regular mail, and the November 2012 demolition notice also sent by regular mail, all establish that the City provided the Yangs with the process they were due.  I disagree.

1. *The posted notices.*  The content of the October 2011 abandoned structure notice is a mystery because it is not in the record.  Thus, it is impossible to determine if this notice was

constitutionally adequate, and it would violate basic tenets of summary judgment to simply assume that the notice supports the City's position, *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).   Similarly, and contrary to the majority's suggestion, the substance of the July 2012 order to repair/demolish posted on the property is also unknown.   So again, there is no basis by which we can assess the adequacy of this notice.

2. *The hearing notice.*   The October 2012 hearing notice, which was sent by regular mail to the Yangs' home address, was unequivocally deficient.   It did, however, provide some information.   The "Re:" line of the hearing notice listed the address of the property.   R. 48-20 at 2.   The notice also informed that a hearing before the Housing Board of Appeals would be held on November 1, 2012, at 7:00 p.m. at City Hall.   The notice explained that the purpose of the hearing was to provide a forum for "all interested parties regarding the City's Notice to Repair or Demolish the structure(s), in conformity to Chapter 10 of the Code of the City of Wyoming." *Id.* The hearing notice further advised that the Yangs had the right to attend the hearing, present evidence, and have an attorney present.

Contrary to the majority's assertion, the hearing notice did *not* alert the Yangs to "inspection-related problems with the property," Op. at 5; indeed, the word "inspection" is never used in the letter, *see* R. 48-20 at 2.   The hearing notice did not provide any reason at all for the impending deprivation.   It simply informed the Yangs that there would be a hearing at which they could present evidence regarding the City's September 2012 order to repair/demolish the structure located on the property.   The September 2012 order was not attached to this hearing notice.   And as previously discussed, the Yangs never received the September 2012 certified mailing, which advised of the City's inspection of the property, the result of that inspection, and the specific provisions of the Code that the structure violated.   No such details were provided in the hearing notice.

We have previously held that "general notice" does "not permit adequate preparation for participation in a meaningful way in any forthcoming hearing," and therefore it does not satisfy due process. *Transco*, 639 F.2d at 323.   In fact, we, along with our sister circuits, have consistently required specific reasoned notice when the government seeks to take action adversely affecting a person's protected property interest. *See, e.g., Garcia v. Fed. Nat. Mortg.*

*Ass'n*, 782 F.3d 736, 741–42 (6th Cir. 2015); *Brody*, 434 F.3d at 130; *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 638–39 (6th Cir. 2005); *Rosen v. Goetz*, 410 F.3d 919, 931 (6th Cir. 2005) (per curiam); *Hamby v. Neel*, 368 F.3d 549, 562 (6th Cir. 2004); *Jefferson v. Jefferson Cnty. Pub. Sch. Sys.*, 360 F.3d 583, 585 (6th Cir. 2004); *Pope v. U.S. Postal Serv.*, 114 F.3d 1144, 1148 (Fed. Cir. 1997); *Buckner v. City of Highland Park*, 901 F.2d 491, 492–94 (6th Cir. 1990); *Holbrook v. Pitt*, 643 F.2d 1261, 1281 (7th Cir. 1981).

In the absence of compelling facts in this case, the majority posits a hypothetical that is a far cry from what happened here. Op. at 7–8. They ask us to imagine a scenario where the government acknowledges that the plaintiff did not receive the original, detailed, and specific notice, so it follows up with a letter in which it asks the plaintiff to call city hall so that it can relay the information contained in the original notice. *Id.* Tellingly, the majority concedes that the information the imaginary plaintiff would receive in the phone call from the government is "necessary". *Id.* at 8. On that point, we agree. It is indeed necessary for a property owner to be provided with the reason(s) for an impending deprivation so that he can adequately prepare for the forthcoming hearing. *Palmer*, 479 F.2d at 166. And it is unequivocally the government's burden to provide adequate notice; the onus is not on the aggrieved to investigate (or divine) precisely why the government plans to deprive him of his protected property interest. *See Mullane*, 339 U.S. at 314. The law in this Circuit is well-settled—"the purpose of notice is to apprise the affected individual of, and permit adequate preparation for, an impending hearing." *Transco*, 639 F.2d at 323.

The skeletal hearing notice sent by the City did not provide enough information. The Yangs were not provided with the reasons the City was contemplating taking some action against their property. The bald reference to Chapter 10 of the City Code was not sufficiently specific, as Chapter 10 consists of at least six potentially applicable articles, four of which also incorporate the analogous provisions of the state code. This lack of specificity rendered the hearing notice fatally deficient, and the subsequent hearing was therefore meaningless because the Yangs could not competently prepare for it. More damning still, the City learned by the time of the hearing that the certified letter containing the detailed order to repair/demolish had been returned as unclaimed.

The majority, singularly focused on "reasonable efforts," makes much of the fact that the City also sent the hearing notice to the Yangs' realtor.[2] Because the notice sent to the realtor was identical to the constitutionally deficient letter sent to the Yangs, it is immaterial whether the City's act of sending it to the realtor was "a mere gesture." Op. at 6. Insufficient notice does not suddenly become sufficient because it is sent to multiple potentially interested parties. Again, the question in this case is not only about the adequacy of the *form* of notice; it is also about whether the notice *informed*.

3. *The demolition notice.* The November 2012 demolition notice informed the Yangs of the outcome of the hearing—the City's order to demolish the structure on the property was affirmed, and the demolition would be completed at the convenience of the lowest bidding contractor. The letter also advised the Yangs of their right to file an appeal in the county circuit court within thirty days.

Although the demolition notice explicitly informed the Yangs that the City was going to demolish the property, it suffers from the primary defect identified in the October 2012 notice in that it does not explain the basis for the City's decision. The letter states that the "Board of Housing Appeals affirmed the City's Notice and Order to Demolish," R. 48-22 at 2, but the Yangs never received that detailed notice, and the Board was well aware of this fact.

The majority, plainly contemptuous of the Yangs' seeming inaction, holds that because the physical demolition was still pending and the Yangs had the opportunity to appeal the Board's decision, the appellate hearing would have provided them the process they were due. It is, in fact, confounding that the Yangs took no action in response to either the October 2012 or November 2012 notices and made no attempt to contact the City until after the demolition was completed in January 2013. However, the majority's focus on this point confuses the issue. We are not presented with a challenge concerning the availability of a pre-deprivation hearing. The issue before the Court is whether the City's notices satisfied due process, and the Yangs'

---

[2]The majority suggests that mailing notice to the realtor was "eminently" reasonable because the return of the certified mailing could *only* mean one of two things—that the Yangs actively refused to accept the City's correspondence or that they no longer lived at their Grand Rapids address. Op. at 6. In the majority's rush to ascribe a malign motive to the Yangs' behavior that has no basis in the record, they overlook an entirely plausible alternative theory—that the Yangs simply were "not home when the postman called and did not retrieve the letter at the post office," *Jones*, 547 U.S. at 234.

behavior has no bearing whatsoever on that question. The City was constitutionally required to use reasonable efforts to notify the Yangs that it planned to demolish their property *and* to provide the reason(s) for its proposed course of action. The City failed to do the latter, and this ends the inquiry.

Even considered in the aggregate, the notices sent by the City were not enough to satisfy its constitutional obligation. Although there is no basis to attribute a lack of good faith to the City in its efforts to inform the Yangs of the impending demolition, the record we have before us demonstrates that the various postings and mailings, even cobbled together, lack any information regarding *why* the City wanted to demolish the property. The majority fixates on the number of notices that were posted and mailed; I am at loss for yet another way to explain that the quantity of notice is wholly irrelevant to the assessment of the quality of notice, *i.e.*, whether the reason(s) for the proposed deprivation were provided.

At this point it is worth emphasizing that all the City had to do to comply with due process is send the September notices (two two-page documents) by regular mail to the Yangs' home address—an endeavor that presumably would have taken less than five minutes and cost less than $1. Incredibly, the majority finds this to be too heavy a burden for the City to bear before commissioning a $22,500 demolition of private property.

### III.

The majority takes what is otherwise an unremarkable property dispute and uses it as a vehicle to drastically reshape the law of procedural due process and shift the burden from government to citizen. According to the majority, the government discharges its constitutional burden when it mails a postcard that simply reads, "The [governmental unit] is contemplating [taking said action] against [property address]," as long as a phone number is included in the letterhead. *See* Op. at 6, 7–8.

Ignoring the factual deficiencies in the majority opinion, its conclusion ultimately rests upon two judgments: (1) the Yangs were not sufficiently diligent in following up with bureaucratic notices; and (2) the Yangs did not stop by to check on their vacant and for-sale

commercial property often enough. The question the majority leaves unanswered for the millions of property owners in this Circuit is this: how diligent is diligent enough?

Are commercial property owners obligated to inspect their lot once every six months? Once every three months? Once a week? Does the frequency change if it is a summer cottage in northern Michigan? What about a farm in Appalachian Ohio? Presumably property owners are at their primary residence nearly every day and will not have to face such uncertainty regarding their homes. Beware taking an extended vacation, though. Or at least reread the majority opinion before you do and try to discern how often you will need to call the city, the county, and the state, to remind them that you still value your property (and to provide a temporary forwarding address for government correspondence). This is not mere rhetorical flourish—in this very case, the property went from being licensed by the government as fit for commercial food service to being condemned by the government as unfit for habitation in just a few months; it was reduced to a pile of rubble not long thereafter. It seems unlikely that the condition of the property could have deteriorated so drastically in such a short time.

## IV.

The undisputed facts in this case reveal that the notices that the Yangs presumably received provided less information than the average parking ticket. The majority errs in holding that such scant notice satisfies due process. I therefore dissent.