RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0013p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

MICHAEL MCINTOSH; REBECCA MCINTOSH,

        *Plaintiffs-Appellants*,

    *v.*

CITY OF MADISONVILLE, KENTUCKY,

        *Defendant-Appellee*.

> No. 24-5383

─────────────

Appeal from the United States District Court
for the Western District of Kentucky at Owensboro.
No. 4:21-cv-00126—David J. Hale, District Judge.

Argued: December 11, 2024

Decided and Filed: January 21, 2025

Before: SUTTON, Chief Judge; BUSH and MURPHY, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:** Thomas E. Springer, III, SPRINGER LAW FIRM, PLLC, Madisonville, Kentucky, for Appellants. James P. Landry, KEULER, KELLY, HUTCHINS, BLANKENSHIP & SIGLER, LLP, Paducah, Kentucky, for Appellee. **ON BRIEF:** Thomas E. Springer, III, SPRINGER LAW FIRM, PLLC, Madisonville, Kentucky, for Appellants. James A. Sigler, KEULER, KELLY, HUTCHINS, BLANKENSHIP & SIGLER, LLP, Paducah, Kentucky, for Appellee.

      SUTTON, C.J., delivered the opinion of the court in which BUSH and MURPHY, JJ., concurred. MURPHY, J. (pp. 11–15), delivered a separate concurring opinion.

————————————

**OPINION**

————————————

SUTTON, Chief Judge.  The City of Madisonville condemned one of several mobile homes that Michael and Rebecca McIntosh own in their Kentucky town.  The City demolished the property a month later.  The McIntoshes filed this § 1983 action in response, alleging that the City deprived them of their due process rights to notice and the opportunity to be heard before tearing down the mobile home, among other claims.  The district court granted the City's motion for summary judgment.  Because triable issues remain over whether the City provided the McIntoshes an adequate opportunity to be heard, we reverse its disposition of this claim and affirm its handling of the other claims.

I.

In 1994, the McIntoshes bought a nine-lot mobile home park in Madisonville, Kentucky, located about 150 miles southwest of Louisville.  After a few years, they began renting out the mobile homes.   In the fall of 2020, a tenant told the City that her mobile home contained mold and mildew and that the McIntoshes failed to fix it.

The City responded to the complaint.  In November 2020, Michael Phillips, the City's code enforcement officer, inspected the home.  He discovered "organic growth" and "moisture droplets" on the ceiling, doors and windows that would not open, and a floor "soft" in some areas. R.24-7 at 7.  The City's building inspector, Frank Wallace, reported similar findings after his own inspection.  He recalled seeing "vegetative growth" on the walls and unstable two-by-fours supporting the ceiling. R.24-6 at 11.  Wallace found that the structure could collapse and deemed the property an unsalvageable danger.

On November 19, 2020, Wallace mailed the McIntoshes a letter on behalf of the City.  It said, among other things:

The property listed above is in violation of the 2012 International Property Maintenance Code. The structure is unsafe for occupancy and Condemned at this time. Be advised that you have thirty (30) days to submit your plans for the renovation and repairs needed to bring this property up to code.

R.23-3. The City placed a notice on the property that said in relevant part:

WARNING

CONDEMNED

DO NOT ENTER

Under the jurisdiction of the Building Official of the City of Madisonville the building is unsafe for OCCUPANCY

Restricted entry by permission of the Building Officials office only

Please Contact Frank Wallace
Building Official
City of Madisonville
270-824-2196

R.23-2.

Mr. McIntosh saw the notice posted on his home and received the condemnation letter. On December 1, he wrote a letter to Wallace and Phillips disputing the City's authority to condemn the home and "respectfully request[ing]" they withdraw their notice. R.23-4 at 1. Mr. McIntosh called Wallace to request a copy of the City's maintenance code, and Wallace gave it to him.

The parties' accounts of what happened next diverge at this point.

The homeowners' account: Mr. McIntosh claims that he tried to contact City officials multiple times to dispute the violations. He called Phillips a few times asking for repair recommendations, but Phillips did not answer and insisted that only Wallace could provide the information. Mr. McIntosh called Wallace's office and, when no one answered, he left a message about the letter and notice. In response, an employee called back and advised him: "If [you] didn't like Frank Wallace's decision, sue them." R.24-5 at 10. Mr. McIntosh asked her how to get a hearing at the "[B]oard of [A]djustment," and she responded that no such board existed. R.24-5 at 10. The City turned off the mobile unit's power. Mr. McIntosh sent a second

letter to Wallace and Phillips.  He explained that he had "inspected and cured the cause of the complaint," a leaking valve on the water heater.  R.24-3.  He added that he would replace damaged plywood panels before another tenant moved in and disagreed that the unit had structural problems.  When Mr. McIntosh again called Wallace's office about his letter, Phillips told him:  "We do not care what your letter said . . . I'm going to tear that house down."  R.24-5 at 18.  Wallace and Phillips never reentered the property to see his repairs.

The City's account:  Wallace claims that Mr. McIntosh did not try to contact him after obtaining a copy of the maintenance code.  Wallace told Mr. McIntosh that he could work with Madisonville to remedy his property's issues, but Mr. McIntosh rejected the offer.  Wallace does not remember seeing a second letter from Mr. McIntosh detailing his repair attempts and asking the City to turn on the electrical power to the unit.  Both Wallace and Phillips say that they reinspected the property before tearing it down but found only cosmetic repairs that did not satisfy the Code.

A month after the initial condemnation, the time for demolition arrived.  That day, Mr. McIntosh called the City Attorney, the Mayor's office, and the County Sheriff to delay the demolition.  His efforts went nowhere.  Mr. McIntosh claimed that Phillips "understood [his] situation and he wasn't going to tear the house down."  R.24-5 at 9.  But when Mr. McIntosh started calling state officials, Phillips changed his mind because "he didn't like that [McIntosh] was talking to somebody from the State."  R.24-5 at 9.  Once more, Mr. McIntosh told Wallace that he had made the necessary repairs and asked him what parts of the Code the home still violated.  Wallace responded that he would not discuss the matter and that the City planned to proceed.  The City removed the mobile home that day.

The McIntoshes sued the City in state court, alleging procedural and substantive due process violations under § 1983 and a trespass violation under state law.  The City removed the case to federal court and sought summary judgment.  The district court granted its motion.  The McIntoshes appeal.

II.

In reviewing the district court's summary judgment decision, we ask the same question that the district court considered:  Have the McIntoshes introduced sufficient facts that a jury could reasonably grant relief on their legal claims?  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986).  In applying this standard, we construe the evidence in the light most favorable to the nonmoving party (the McIntoshes).  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

A.

*Procedural due process*.  The Fourteenth Amendment says that the States may not "deprive any person of life, liberty, or property, without due process of law."  When it comes to property that a State or city wishes to condemn, the relevant government unit must give the owner "notice" and the "opportunity to be heard" before tearing down the property.  *Warren v. City of Athens*, 411 F.3d 697, 708 (6th Cir. 2005).  A few words are in order about each component of this standard.

As to notice, due process requires a statement "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."  *Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).  The idea is to give property owners a meaningful chance to object to the proposed destruction of their property.  *See Palmer v. Columbia Gas of Ohio, Inc.*, 479 F.2d 153, 166 (6th Cir. 1973).  The notice thus must "inform" the homeowners "of the availability of an opportunity to present [their] objections."  *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 14 (1978) (quotation omitted).  If "generally available state statutes" detail procedures for obtaining a hearing before the destruction of the property, a municipality typically "need not take other steps to inform" the property owner of their "options."  *City of West Covina v. Perkins*, 525 U.S. 234, 241 (1999).

As to the opportunity to be heard, due process requires "some kind of a hearing *before* the State" destroys the property, absent an emergency.  *Zinermon v. Burch*, 494 U.S. 113, 127 (1990).  No emergency existed in this instance, as a month passed between the condemnation

notice and the actual demolition of the vacant home, precluding the City from claiming a "necessity of quick action" or other "impracticability" that might permit only post-deprivation remedies. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436 (1982) (quotation omitted). That means the City needed to provide the McIntoshes with a hearing before the demolition. While the hearing requirement remains flexible to account for different situations—hence the reference to "some kind of a hearing"—it remains an imperative.

Measured by these principles, the City met its obligation to provide notice to the property owners but did not meet its obligation to provide a pre-demolition hearing to them.

Start with notice. Mr. McIntosh received and read the condemnation notice and letter informing him that he had thirty days to submit his plans for "renovation" and "repairs." His subsequent efforts to repair the property and his serial efforts to contact city officials show that the notice worked.

True, the condemnation letter did not list each of the property's specific defects. But we do not demand a "level of specificity required of a criminal indictment." *Yashon v. Hunt*, 825 F.2d 1016, 1025 (6th Cir. 1987). All that was needed was sufficient notice for the McIntoshes to "quickly and intelligently take available steps to prevent the threatened" action. *Palmer*, 479 F.2d at 166. That happened.

True also, the letter and posted notice did not explain the couple's right to a hearing before the proposed demolition. But the generally applicable municipal laws sufficed. *City of West Covina*, 525 U.S. at 241. "Any party aggrieved by any decision of [a] Building Inspector," the City's Code says, "may appeal that decision to the Local Appeals Board," which must convene within fifteen days of receiving an appeal and render a decision five days after that. R.23-6 at 3; Madisonville, Ky., Code of Ordinances § 150.13(C)–(E) (1994). Property owners may then appeal an adverse decision to the Department of Housing, Buildings and Construction. *Id.* § 150.13(E); Ky. Rev. Stat. Ann. § 198B.070(4). While a city would do well to consider providing homeowners direct notice of their right to a hearing before it destroys their property, these generally applicable laws supply the notice required by due process, *see City of West*

*Covina*, 525 U.S. at 241, given the background principle that citizens "are presumptively charged with knowledge of the law," *Atkins v. Parker*, 472 U.S. 115, 130 (1985).

A different conclusion applies to the City's duty to give the McIntoshes an opportunity for a hearing *before* the City destroyed their property. The key problem is that the City Code says that property owners have a right to a hearing before a Local Appeals Board over a grievance against "any decision of the Building Inspector"—in this instance, Wallace. Madisonville, Ky., Code of Ordinances § 150.13(C)–(D) (1994). But the City never delivered on that promise. In his deposition, Wallace confirmed that "there's not an appeal board in Madisonville" to hear this type of claim. R.24-6 at 10. While Wallace agreed that § 150.13 "does call for an appeals council or appeals board for appealing any" of his decisions, he insisted that the City did not have one. R.24-6 at 10. When pressed about this deviation from the municipal code, Wallace explained that city officials have considered setting one up but concluded it "didn't feel . . . necessary" given other, more informal means of disputing a condemnation. R.24-6 at 10. This could be why, when Mr. McIntosh asked an employee of Wallace's office how to appeal (albeit, to what he called the "Board of Adjustment"), she told Mr. McIntosh that no such board existed. R.24-5 at 10. Wallace's certainty that no board existed and his employee's response to the McIntoshes' inquiry along the same lines would permit a reasonable juror to characterize the City's statutory promise of a hearing as illusory.

The City pushes back, arguing that the McIntoshes had other, less formal opportunities for a pre-deprivation hearing and failed to pursue them. The City claims that, if property owners disagree with a condemnation recommendation, officials "sit down and have a conversation with" the homeowners about the violation and "the scope of work" needed for repairs. R.24-6 at 11–12. If property owners remain dissatisfied, they may appeal the Building Official's decision to the Madisonville City Attorney, who acts as "an arbiter." R.24-6 at 10.

Let us assume for the sake of argument that this option—not mentioned in the City's generally applicable laws—constitutes an adequate chance to be heard. Problems remain even still. The only evidence of such a policy arises from Wallace's testimony, not a provision in the City's Code. Unlike appeals processes engrained in statutes, this "procedure, if it existed at all, depended on the vagaries of word of mouth referral," creating the imperative that the City tell the

McIntoshes about this opportunity. *Memphis Light*, 436 U.S. at 14 n.14 (quotation omitted); *see Palmer*, 479 F.2d at 168 (rejecting the claim that "the mere theoretical possibility of informal resolution" with company figures—a possibility unknown to customers—meets due process standards). Yet neither the condemnation flyer nor its related letter nor the statements of any official conveyed to the McIntoshes the opportunity to speak with Wallace and the City Attorney about the proposed demolition. Making matters worse, none of those sources ever informed the McIntoshes precisely what provisions of the municipal code their unit violated—and had to be repaired. A reasonable juror could find that no such policy existed or that, even if it did, the City never told the property owners about it.

Even the possibility of inquiry notice does not help the City. Recall that Mr. McIntosh tried to contact City officials to discuss the state of the property through various calls, two letters, and in-person questions on demolition day. Each time, officials rebuffed him, and each time they failed to mention the possibility of a meeting with Wallace or an appeal to the City Attorney. The property owners asked the very questions inquiry notice might demand, and the City officials never told them about any other route to a hearing or procedure to protect their rights.

The City adds that a "property owner may challenge the Building Official's decision in Hopkins District Court." Appellee's Br. 11. Kentucky law, it is true, permits some challenges along these lines in state court. Ky. Rev. Stat. Ann. § 65.8831. But that law applies only to appeals of *final orders* from a local administrative body or a local hearing officer (who cannot work for the City). *Id.* §§ 65.8828, 65.8829(2)(b), 65.8829(7)(c), 65.8831; *see Short v. City of Olive Hill,* 414 S.W.3d 433, 445 (Ky. Ct. App. 2013) (discussing an appeal from a local code enforcement board's final order). Because no local bodies issued final orders (and indeed no such local bodies even existed, according to Wallace), the McIntoshes could not protect themselves under that provision.

The City maintains that the McIntoshes forfeited portions of their procedural due process claim in the district court. It objects that the McIntoshes on appeal have identified new statutory and case citations. But raising a new "particular authority" on appeal does not risk forfeiture "as long as the issue itself was properly raised" below. *Mills v. Barnard*, 869 F.3d 473, 483 (6th Cir.

2017). The McIntoshes did just that. They raised claims about the opportunity to be heard in both their amended complaint and in response to Madisonville's motion for summary judgment. The district court addressed the claims on the merits. Nothing prohibited the McIntoshes from reinforcing those arguments with more citations on appeal—a run-of-the-mine feature of nearly every appellate brief and of some appellate court decisions themselves.

B.

*Substantive due process.* While the language of the Due Process Clause focuses on procedural safeguards, "the Supreme Court has added discrete substantive protections" for fundamental rights unmentioned in the Constitution. *Gore v. Lee*, 107 F.4th 548, 562 (6th Cir. 2024). One such right—the one the McIntoshes claim that Madisonville violated—is "the right to be free from conscience-shocking actions." *Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014). Meeting this test is no mean feat. "Only the most egregious official conduct can be said to be arbitrary in the constitutional," as opposed to conversational, "sense." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1988) (quotation omitted).

The City's actions did not rise to this level. The City condemned the home due to its mold, moisture, and structural weaknesses, all in violation of the International Property Maintenance Code. This routine exercise of the police power, even if a challenged exercise of the police power, does not implicate the kind of conscience-shocking government acts that substantive due process prevents. Wallace possessed the relevant decision-making authority, and the City had the relevant power. Because we know of no court that "has held that it shocks the conscience for municipal authorities, acting pursuant to an unchallenged ordinance, to order the destruction of a building found by responsible officers to be a nuisance or threat to public health or safety," the district court correctly granted summary judgment to the City on this claim. *Harris v. City of Akron*, 20 F.3d 1396, 1405 (6th Cir. 1994).

In challenging this conclusion, the McIntoshes point to evidence that city officials turned off the unit's power to prevent Mr. McIntosh from making further repairs, employed police to intimidate him by supervising demolition day, and never provided a hearing along the way. But even if a jury credited that evidence, Wallace's police power authority remained legitimate.

A mere dispute over the exercise of an accepted police power does not create a substantive due process problem, as opposed to the possibility of a procedural due process defect.

## C.

*Trespass.* The district court declined to exercise its supplemental jurisdiction over this state law claim after granting summary judgment on all of the federal claims. On remand, we leave it to the district court to decide in the first instance whether to exercise jurisdiction over this claim in light of future proceedings about the procedural due process claim.

For these reasons, we reverse in part and affirm in part.

———————————

**CONCURRENCE**

———————————

MURPHY, Circuit Judge, concurring.  This case shows that an evolving-standards approach to constitutional interpretation can destroy rights just as much as it can create them. The Fourteenth Amendment's Due Process Clause makes it illegal for a State to "deprive any person of life, liberty, or property, without due process of law[.]"  U.S. Const. amend. XIV, § 1. This constitutional text raises two basic questions: Has a State threatened to deprive a person of "life, liberty, or property"?  If so, what is the "process" that is "due" for this threatened deprivation?

Historically, the Due Process Clause provided *capacious* protections ("due process of law") to a *modest* set of interests ("life, liberty, or property").  To start, the words "life, liberty, or property" traditionally reached only a "a small collection of rights."  Frank H. Easterbrook, *Substance and Due Process*, 1982 Sup. Ct. Rev. 85, 97–98.  They referred to what William Blackstone called "the 'absolute' rights" of individuals in the state of nature and what we would call "private rights" today.  Caleb Nelson, *Adjudication in the Political Branches*, 107 Colum. L. Rev. 559, 566–67 (2007); *see* 2 St. George Tucker, *Blackstone's Commentaries* 123–24, 128–29 (1803).  According to Blackstone, a person's specific right to "property" "consist[ed] in the free use, enjoyment, and disposal of all his acquisitions, without any control or diminution, save only by the laws of the land."  2 Tucker, *supra*, at 138.  So the word "property" referred to both the "bundle of rights" that a person obtained when becoming the owner of lands or goods as well as those lands and goods themselves.  *Cedar Point Nursery v. Hassid*, 594 U.S. 139, 150 (2021); 2 Samuel Johnson, *Dictionary of the English Language* 418 (4th ed. 1773); *see* Restatement (First) of Property ch. 1, intro. note (Am. L. Inst. 1936).

Next, the phrase "due process of law" provided robust protections to these narrow interests.  As the Supreme Court explained before the Fourteenth Amendment's adoption, the phrase referred to the "settled usages and modes of proceeding existing in the common and statute law of England" that the colonists adopted on this side of the Atlantic.  *Murray's Lessee*

*v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 277 (1856). Or, as Justice Story put it, the phrase referred to the "process and proceedings of the common law." 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1783, at 661 (1833). Of most relevance here, this incorporation of common-law protections set a "constitutional baseline" of "*judicial* process," presumptively requiring a neutral court to stand in between the government and its people's private rights. *SEC v. Jarkesy*, 144 S. Ct. 2117, 2145 (2024) (Gorsuch, J., concurring); *see* Nathan S. Chapman & Michael W. McConnell, *Due Process as Separation of Powers*, 121 Yale L.J. 1672, 1807 (2012); Nelson, *supra*, at 569–70. The people thus had the right "to 'judicial' determination of the facts that bore on" the government's claim that it could deprive them of private rights. Nelson, *supra*, at 591.

At first blush, this historical approach to the Due Process Clause makes this case look easy. Frank Wallace, the building inspector for the City of Madisonville, Kentucky, condemned a mobile home owned by Michael and Rebecca McIntosh after finding that this home violated various municipal building codes. Thirty days later, Wallace and other officials tore the home down over Mr. McIntosh's continued objections. Before destroying this home, the city officials never initiated a court proceeding to decide whether the home's dilapidated state did, in fact, render it subject to condemnation under the ordinance. And, as Chief Judge Sutton's opinion explains, the officials also identify no viable state-law path by which the McIntoshes could have obtained a judicial finding about the home's condition. The officials instead argue that they provided the McIntoshes with the required process simply by giving them the option to negotiate with Wallace over the home's problems and to "appeal" his finding to the city attorney. *See McIntosh v. City of Madisonville*, 2024 WL 1288233, at *6 (W.D. Ky. Mar. 26, 2024).

I find little support in the Due Process Clause's original meaning for this (somewhat astonishing) claim. There can be no doubt that the McIntoshes' ownership interest in their mobile home fell with the traditional definition of "property." And there can be no doubt that the city officials "deprived" the McIntoshes of this property when they destroyed it. The officials' conduct thus seemingly gave the McIntoshes the right to the judicial "proceedings" that the "common law" would have provided. Story, *supra*, § 1783, at 661. This right presumptively included the need for a court finding at some point that the home qualified as a nuisance under

the local ordinance.  As one state court suggested shortly after the Fourteenth Amendment's adoption, "[t]he authority to decide when a nuisance exists, is an authority to find facts, to estimate their force, and to apply rules of law to the case thus made.  This is a *judicial* function[.]"  *Hutton v. City of Camden*, 39 N.J.L. 122, 129–30 (N.J. 1876) (emphasis added).  Many more cases support this "fundamental" point "that the declaration of a nuisance is a proceeding of a judicial nature" and that municipalities cannot simply "declare that to be a nuisance which is not such" under the governing law.  John B. Uhle, *Summary Condemnation of Nuisances*, 39 Am. L. Reg. 157, 160, 164 (Mar. 1891).

To be sure, the Due Process Clause contains exceptions to this "constitutional baseline" requiring executive officials to initiate court proceedings before depriving individuals of property.  *Jarkesy*, 144 S. Ct. at 2145 (Gorsuch, J., concurring).  In *Murray's Lessee* itself, the Court recognized one such exception for proceedings against federal tax collectors.  59 U.S. at 277.  It explained that the common law had long allowed "a summary method for the recovery of debts due the crown," particularly "those due from receivers of the revenues."  *Id.*  And although the parties have not briefed the question, I suspect that another exception might allow executive officials "to summarily destroy or remove nuisances" in emergency situations when the nuisances threaten public health or safety.  Uhle, *supra*, at 159 (quoting *Lawton v. Steele*, 119 N.Y. 226, 235 (1890)).  As the majority opinion notes, however, the city officials here have not suggested that any emergency existed when they destroyed the mobile home.  Nor have the city officials pointed to any other historically based exception to the constitutional baseline.

So how can the officials argue that their proposals (allowing the McIntoshes to negotiate with the building inspector or appeal to a city attorney) gave the couple "due process of law"?  According to these officials, their actions comported with the Due Process Clause under the modern "balancing" approach to due process from cases like *Mathews v. Eldridge*, 424 U.S. 319 (1976), and *Goldberg v. Kelly*, 397 U.S. 254 (1970).  In *Goldberg*, the Supreme Court expanded the reach of the Due Process Clause beyond the "traditional common-law concepts of property" to cover new "property" interests—such as the interest in welfare payments.  397 U.S. at 261–62 & n.8; *see Bd. of Regents v. Roth*, 408 U.S. 564, 571–72 (1972).  But this expansion would have created massive burdens if the Court had kept to the traditional meaning of "due process of law"

by requiring judicial proceedings before depriving individuals of these new forms of "property." So the Court also watered down the right's traditional protections by holding that the guaranteed process "need not take the form of a judicial or quasi-judicial trial." *Goldberg*, 397 U.S. at 266. Rather, the Court suggested that the government need only provide a "meaningful" hearing—with the judiciary deciding as a policy matter what process satisfied this "meaningful" benchmark. *Id.* at 267 (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)); *see* Easterbrook, *supra*, at 125. In *Mathews*, the Court distilled this policy-rooted inquiry into its modern balancing test that decides the proper procedures based on the private and public interests at stake and the risk of "an erroneous deprivation" from the process that the government provided. 424 U.S. at 335.

Applying this balancing test here, the district court held that the city officials provided "constitutionally adequate" process because, among other reasons, they had "determined" that the home qualified as a nuisance. *McIntosh*, 2024 WL 1288233, at *6. So the court read the balancing test to sanction the destruction of traditional property based on nothing more than an executive official's say-so. This case thus shows how a court-created expansion of a right can lead to its contraction. The "minimal version" of the Due Process Clause that the Supreme Court adopted for new interests that would not normally trigger its protections becomes "legitimized," and lower courts then gradually apply this minimal version to interests that *do* fall within the clause's core. Philip Hamburger, *Purchasing Submission: Conditions, Power, and Freedom* 186 (2021).

We should exercise caution before taking this course. At the least, we should apply this modern balancing test in a way that allows for the "preservation of past rights," as the Court has done in other contexts. *United States v. Jones*, 565 U.S. 400, 407–08 (2012). When the "private interest" at stake qualifies as a traditional private right, perhaps the traditional process due should become the default process due under the modern balancing approach. *Mathews*, 424 U.S. at 335. And the government must show that the process it provided at least matches the protections provided by this traditional process. *Cf. Pacific Mut. Life Ins. v. Haslip*, 499 U.S. 1, 31 (1991) (Scalia, J., concurring in the judgment) (discussing *Hurtado v. California*, 110 U.S. 516 (1884)).

Because Chief Judge Sutton persuasively explains why the processes that the city officials provided here did not meet this test, I am pleased to concur in the majority opinion.